**UNITED STATES of America, Appellee,**

**v.**

**Fletcher WILLIAMS, Appellant.**

**No. 79-2237.**

United States Court of Appeals,
Third Circuit.

Argued Feb. 12, 1980.

Decided June 23, 1980.

Sandra D. Jordan (argued), Asst. U. S. Atty., Robert J. Cindrich, U. S. Atty., Frederick W. Thieman, Asst. U. S. Atty., Pittsburgh, Pa., for appellee.

Paul R. Gettlemen (argued), Zelienople, Pa., for appellant.

Before ADAMS, GARTH and VAN DUSEN, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge.

Fletcher Williams appeals his conviction for violations of 21 U.S.C. § 841(a)(1) (distribution of heroin) and 21 U.S.C. § 843(b) (misuse of communication facilities in distribution of heroin). The sole ground for reversal urged on appeal is ineffective assistance of counsel. In a prior proceeding we remanded the case to the district court for an evidentiary hearing on this issue. *United States v. Williams*, 588 F.2d 825 (1978) (mem.). Having reviewed the record of that hearing and the district court's opinion, which held that Williams had exemplary trial representation rather than inadequate counseling, we too are satisfied that Williams was not denied effective assistance of counsel and that thus his sixth amendment right to counsel was not violated. We accordingly affirm Williams' convictions.

### I.

The controversy in this case centers around two affidavits. The two key wit-

nesses against Williams were Pearl and Barron Kelly Brooks (Kelly), husband and wife, who testified to narcotics transactions between Williams and themselves. Some months prior to trial, Williams came into possession of signed affidavits of Pearl and Kelly Brooks in which they denied that there ever were any such transactions.[1] Williams gave one or both of these affidavits to his counsel and demanded that they be used to impeach the credibility of Pearl and Kelly Brooks should they testify at trial against Williams.

Defense counsel, however, did not use the affidavits to impeach the Brookses. He stated that he had been informed by the Government that it was prepared to prove that the affidavits had been executed under duress, including threats of harm to the Brookses' children. *See* Trial Transcript, Feb. 27, 1979, at 34–35. Such evidence, he believed, would seriously harm Williams both with respect to the jury's determination of guilt or innocence, and in regard to sentencing. *See id.* at 35. Moreover, he reasoned, the only way to try to rebut the Government's claim that the affidavits were coerced would have been to have Williams testify, thus opening Williams to damaging cross-examination on all aspects of the case, including tape-recorded conversations between Williams and Pearl Brooks. *See id.* at 37; app. to dissenting op. *infra*

(typescript of conversation). Defense counsel therefore determined not to introduce the affidavits, and Williams was ultimately convicted by the jury of four out of the five counts charged. He was sentenced to two concurrent sentences of eight and fifteen years, to be followed by three years special parole.

## II.

The testimony of Pearl and Kelly Brooks was central to the Government's case, and it is not seriously contended that Williams could have been convicted without it. Thus, if indeed Williams was denied effective assistance of counsel by virtue of the failure of counsel to use the affidavits to discredit the Brookses, we could not characterize that action as harmless error.

■ In this Circuit, the standard for effective assistance of counsel is "the exercise of the customary skill and knowledge which normally prevails at the time and place." *Moore v. United States*, 432 F.2d 730, 736 (3d Cir. 1970). We are therefore confronted with the question whether defense counsel's decision not to use the affidavits and the reasons leading to that decision fell within the range of behavior properly to be expected of defense counsel.

> My true statement is true. Mr[.] Fletcher Williams has never sold me or my wife any narcotics, pill or any other unlawful subtance [*sic*] not at anytime or place in Oct[.] or Nov[.] 1976 or any other time in my life, on or about Oct[.] or Nov[.] 1976 and at other times I lied about sales and other things in regard to Mr. Williams in order not to be incorsorated [*sic*], or for my wife not to in corsorated [*sic*], as a resualt [*sic*] of my lies, Mr[.] William [*sic*] was arrested and is now I[']m sure wondering why I would just lie for no reason. I want this sworn statement of the true fact to also note, I was giving [*sic*] by verious [*sic*] law inforcement [*sic*] officers (a choise [*sic*]) some more time on this street, which I thought ment [*sic*] real freedom, in exchange [for] lies about Mr[.] Williams. My God forgive me and have mercy on my soul because everything I singed [*sic*] or stated about Mr[.] Williams at that time or any other time about narcotic [*sic*] in any way any style or manner is a lie.

1. One affidavit executed by Pearl and Kelly Brooks (Exhibit B) reads in part:

   > Mr. Fletcher Williams did not at anytime sell us any drug of any kind . . . there has [*sic*] not been any threats of any kind mad [*sic*] to me or my family[.] The dates I was supposed to have bought drugs were Oct[.] 6, 1976 & Nov[.] 6, 1976.
   >
   > Statement given is of our own free will and true and correct to the best of our knowledge.

   Another affidavit of Kelly Brooks (Exhibit A) reads in relevant part:

   > This is not only a confession of a true fact. But it is the truth in writing to free not only my soul and mind, I want to be released from the dishonor of a lie. I Kelly Brooks am swearing this true statement of my own free will[.] I am under no herastment [*sic*] of any kind neither is any one in my family or even close to me in any danger from Mr. Williams[.]

■ Following our remand for an evidentiary hearing, the district court heard testimony of Williams and his various counsel in its consideration of the merits of Williams' claim:

Trial counsel testified at the evidentiary hearing that he did not use the affidavits because, *inter alia*, the prosecuting Assistant United States Attorney had advised him that the government was prepared to prove that the affidavits were executed under duress, possibly including threats of harm to the children of Pearl and Kelly Brooks. Not only would testimony that the affidavits had been obtained through threat of bodily harm be severely detrimental to prospects of acquittal but could, also in counsel's opinion, adversely affect sentencing considerations should conviction follow. Bearing in mind the foregoing pitfalls, trial counsel decided during the trial that use of the contradictory affidavits would not be in the best interest of his client, notwithstanding their obvious contribution to the ongoing battle of credibility.[1]

[1] February 27, 1979 Hearing Tr., p. 34-35.

Williams insists, however, that while trial counsel may have chosen the proper strategy had the affidavits in fact been obtained under duress, no effort was made to independently determine whether they might have been made voluntarily. To the contrary, trial counsel indicated that he relied on several factors before concluding the statements were probably given under duress. According to his testimony, trial counsel relied upon the government's representation, photographic evidence, surveillance by Allegheny County Police Officers and Drug Enforcement Agents, and tape recordings for his opinion that the affidavits did not have the ring of truth.[2] Trial counsel

[2] February 27, 1979 Hearing Tr., p. 39.

diligently analyzed a multiple of factors before reaching a judgment.

In any event, the actual voluntariness of the affidavits was not of critical importance. Trial counsel again testified that as long as he was convinced that Pearl and Kelly Brooks would testify that

threats were made, it would have been difficult, if not impossible, to rebut such testimony except by tendering Williams as a witness subject to potentially fatal cross examination.[3] Carefully weighing

[3] February 27, 1979 Hearing Tr., p. 51-52.

these considerations, utilization of the affidavits, even if voluntarily given, would have been fraught with danger once Pearl and Kelly Brooks testified they were obtained under duress.[4]

[4] It would be illogical to assume that Pearl and Kelly Brooks would testify to the voluntariness of the affidavits after having previously contradicted the contents of the affidavits in their trial testimony.

Even a cursory review of either the trial transcript or the hearing testimony reveals that trial counsel far surpasses customary skill and knowledge. At trial he aggressively and intelligently represented Williams. His reasons for failing to use the affidavits at trial indicate a thoughtful and well-considered decision. That Williams was convicted in spite of exemplary trial representation is testimony to his actual guilt of the crimes charged. Trial counsel in the case *sub judice* exercised exceptional skill and knowledge far above that which normally prevails. Accordingly, Williams was not denied effective assistance of counsel as required by the Sixth Amendment when trial counsel chose not to use the affidavits of Pearl and Kelly Brooks.

*United States v. Williams*, Crim. No. 77–110, Slip op. at 3–5 (W.D.Pa. Aug. 15, 1979). After consideration of the record, it is clear that the district court's findings are not clearly erroneous.

### III.

■ Williams has argued that he was denied effective assistance of counsel because his attorney relied on the Government's representation that it could prove duress, without fully investigating or preparing the case himself. *See Gaines v. Hopper*, 575 F.2d 1147 (5th Cir. 1978) (per curiam). In *Gaines*, defense counsel failed even to consider as plausible the defendant's version of the facts and limited his

investigation to discussions with the prosecutor and police officers. Defense counsel had a total lack of knowledge of the defendant's position. In the present case, while defense counsel failed to interview the Brookses and never ascertained the nature of the Government's proof of duress, he was nevertheless fully aware of Williams' position and had before him all of Williams' evidence, the two affidavits. He could reasonably have concluded from the tenor of the affidavits and from the other overwhelming corroborating proof of the crimes that the affidavits were false and must have been the product of coercion, despite some evidence of their voluntariness, such as the fact that the Brookses had sought out Williams to give him the affidavits, Trial Transcript, Feb. 27, 1979, at 100.

However, as the trial court recognized, more important than whether the affidavits were in fact coerced is counsel's evaluation of the potentially devastating effect of their introduction. There would at least have been a question as to the voluntariness of the affidavits, and counsel determined that shifting the focus of the trial to this issue would have harmed Williams more than using the affidavits to discredit the Brookses would have helped him. Of particular significance is counsel's response at the evidentiary hearing to one question:

Q. [Williams' attorney on appeal]. Okay. I only have one final question. If you had attempted an independent investigation and you would have been satisfied at least at the time when the affidavits were made that they were made voluntarily, and subsequent to that the Brookses might have changed their mind and might even have been coerced to testify, would you at that point have used them on behalf of Mr. Williams?

A. [Williams' trial counsel]. No. Because as long as I was convinced that the Brookses would so testify that there were threats, it would be up to the jury to decide whether threats had been made or had not been made. But it would have certainly opened the door to a whole set of circumstances that in my opinion could do no good for Fletcher Williams and might have put him in a worse position on the downside after conviction than he faces today. So I wouldn't have used it once the Brookses, as Mr. Panneton advised me, would have indicated that the statements were given under duress.

The fact that the notary who took the statement would have indicated that they seemed calm and relaxed would not have prevented the Brookses from doing as Mr. Panneton [Assistant U.S. Attorney] indicated would be the likely result of the rebuttal testimony. And I would not have been in a position unless I submitted Fletcher Williams as a witness to the trial jury and to Mr. Panneton on cross examination on the whole of the case to rebut the open season that the Brookses would have had on Williams with respect to threats. So I chose not to use the statements and wouldn't have used the statements.

*Id.* at 51–52. We cannot say that this was an unreasonable decision, much less an error in advocacy of sufficient magnitude to depart from the *Moore* standard.[2]

Williams' reliance on *United States v. Dingle*, 546 F.2d 1378 (10th Cir. 1976), is misplaced. *Dingle* stated in dictum that "[i]t is error not to call a witness when that witness would present the *only* defense available," *id.* at 1385 (citation omitted) (emphasis in original). The present case is distinguishable for two reasons. First, the affidavits do not present a defense but merely could have affected—positively or negatively—Williams' contention that the Brookses were not telling the truth. Second, another defense was available and was asserted: the defense that Pearl Brooks had not been sufficiently searched to make sure she was not carrying the

---

2. Trial counsel's fear that Williams might have been given enhanced or consecutive sentences had testimony of threats to the Brookses and their children been introduced and believed, instead of the concurrent sentences ultimately imposed was a reasonable concern. *Cf. United States v. Grayson*, 438 U.S. 41, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978) (trial judge may consider in fixing sentence defendant's false testimony at trial).

narcotics *into* Williams' apartment before meeting him, so as to frame him. *See* Trial Transcript, Feb. 27, 1979, at 32–33, 49 (discussion at evidentiary hearing of defense strategy); Trial Transcript, Dec. 1–6, 1977, at 60–61, 69–70, 118–123, 127, 137–38, 275–76, 286–87, 296–98, 303, 306, 309, 321–22 (questioning of witnesses with regard to searches conducted).

## IV.

Buttressing the trial court's conclusion that Williams was not denied effective assistance of counsel is the plain fact that Williams himself never attempted to have the affidavits introduced and did not object until his appeal to counsel's failure to utilize or introduce them. A fair reading of the record reveals that Williams was apprised in advance of trial of counsel's skepticism and reluctance to use the affidavits. Counsel testified:

Q. When you had this conversation with Mr. Panneton did you come back and discuss this with Mr. Williams?

A. I did.

Q. Did you tell him that the government was going to introduce threats?

A. Yes.

Q. Was there anybody else present when this conversation took place?

A. I think I told him that in the bathroom at the Hilton Hotel. Because I wanted him to feel free without anyone being present to tell me whether threats were used or not.

Q. What did he tell you?

A. He told me no threats were used and he wanted me to use the statement.

\*   \*   \*   \*   \*   \*

Q. This discussion that you had in the bathroom with Mr. Williams, did you ever indicate—or you gave him back the affidavit at that point, didn't you?

A. I gave him back what, sir?

Q. An affidavit.

A. Exhibit A [Kelly Brooks' affidavit]. I don't recall seeing Exhibit B [affidavit of Pearl and Kelly Brooks].

Trial Transcript, Feb. 27, 1979, at 45, 47. Counsel testified as well:

Q. Did you ever discuss with Mr. Williams these threats?

A. Yes.

Q. Did he still say that he wanted to use these affidavits?

A. He denied at all times any threats and said that he wanted the statements used.

\*    \*    \*    \*    \*    \*

. . . I applied my knowledge of the case in totality, considering the photographic evidence, the surveillance by a team of Allegheny County Police Officers and DEA agents, the tape recordings, and then matched the sum of all these things against a document that I felt did not have the ring of truth, *but I withheld judgment on whether I would use the document indicating to Mr. Williams that the execution of these documents was important to me only to the extent that they may indicate that perhaps the Brookses wouldn't testify for the government.*

*Id.* at 39 (emphasis supplied). Williams thus knew that his counsel would not seek to impeach the Brookses with the affidavits once they did testify for the Government, despite Williams' testimony that he was never definitively told *before* trial that the affidavits would not be used, *see id.* at 6, 13.

This record also supports the conclusion that Williams was not surprised by counsel's actions in not employing the affidavits. Williams had already discharged a number of attorneys when he first consulted with this trial counsel.[3] When Williams explained his version of the case at his initial consultation with this counsel, he was told in unequivocal terms "that a judge would bury [him]" if the affidavits were used. *See id.* at 5. Despite this, Williams still retained this counsel to represent him at

---

**3.** Williams employed a total of seven attorneys on this case, five before and through trial, and two more afterwards. *See* Trial Transcript, Feb. 27, 1979, at 12.

trial[4] and never attempted to discharge him. Moreover, at the conclusion of the trial, Williams kissed his attorney on the cheek and told him he had done a wonderful job. *Id.* at 44. Finally, Williams never indicated to the trial judge, either during or after trial, that he himself wanted the affidavits used or introduced. *See id.* at 8–9, 13. Of even greater significance, the record reveals that at no time after Williams' counsel had rested Williams' defense, did Williams question his forbearance in using the affidavits.

■ It is thus clearly apparent that Williams ultimately concurred in his counsel's tactical decision not to use the affidavits to impeach the Brookses. Hence, there is no merit to Williams' intimation on appeal that he was deprived of effective assistance of counsel because he was never explicitly told that the affidavits would not be introduced.[5]

### V.

Our examination of this record satisfies us that Williams was not denied effective assistance of counsel. We will therefore affirm the judgment of sentence imposed on Williams on January 11, 1978.

ADAMS, Circuit judge, dissenting.

Along with the question of the effectiveness of trial counsel's assistance, this case also poses an important as well as a novel question regarding the respective authority of a defendant and his counsel in a criminal matter. Specifically, the novel issue is whether counsel overstepped the bounds of his proper role as the defendant's representative by ignoring his client's wishes with respect to what is conceded to have been the most important decision in the case regarding defense strategy, and instead proceeded as he, the attorney, believed appropriate. The record demonstrates that Fletcher Williams persistently requested his counsel to use affidavits to impeach the credibility of two prosecution witnesses, that counsel continuously put off telling Williams definitively whether he would introduce the affidavits, and that counsel ultimately misled Williams in this regard. In my view, such conduct denied Williams his Sixth Amendment right to exercise final authority over the central decision of defense strategy. At the very least, the attorney's failure to advise Williams that he definitely would not use the affidavits denied Williams the right to be represented by counsel of his choice—namely, one who would comply with Williams' wishes with respect to the affidavits. Moreover, I would hold that Williams was denied effective assistance of counsel by the attorney's failure to investigate the circumstances underlying the prosecution witnesses' testimony. For these reasons, I would reverse Williams' conviction and remand for a new trial.

### I.

At Williams' trial for distribution of heroin and for misuse of communication facili-

---

4. Williams undoubtedly trusted counsel's judgment, based on counsel's experience and qualifications. Counsel explained to the court:

> I'm a graduate of the Harvard Law School in 1957. I served as Assistant District Attorney under Frank S. Hogan. I was appointed as Special Attorney to the United States Department of Justice before the strike forces were formed by Attorney General Kennedy. And I served here in Pittsburgh as a special prosecutor under the United States Attorney, then Joseph Ammerman.
> I have taught trial advocacy at Harvard Law School, Hofstra Law School, New York School, at a course given by United States Attorney Robert Fisk[e] and District Attorney Robert Morgantha[u] for newly appointed prosecutors, and I have lectured at the Practicing Law Institute on trial advocacy.

Trial Transcript, Feb. 27, 1979, at 36. Counsel further testified that he tries about ten federal cases a year, primarily as criminal defense counsel. *See id.* at 52–53.

5. The dissent argues that counsel usurped Williams' prerogative to decide the scope and extent of the cross-examination of the Brookses and misled Williams as to whether or not the affidavits would be used. These issues implicit in the dissent's argument simply are not raised on the record of this case or as questions for consideration in Williams' brief on appeal. As we have noted, Williams, with full knowledge of his counsel's strategy, took no steps to discharge counsel or object to the court, or for that matter to raise this issue with his counsel at any time prior to the jury's verdict.

ties in distributing heroin,[1] Pearl and Barron Kelly Brooks, wife and husband, testified for the prosecution that they had purchased heroin from Williams. It is conceded that their testimony was the critical element of the prosecution's case.[2] Several months prior to trial, Williams obtained two affidavits signed by the Brookses in which they denied purchasing any heroin from Williams. The Brookses also swore that they executed the affidavits freely and without threats or harassment from Williams.[3] Williams gave these affidavits to his attorney and requested on a number of occasions that they be used in cross-examining the Brookses. Each time, counsel expressed his reluctance to employ the affidavits, but avoided giving Williams a definitive answer. The attorney ultimately chose not to introduce the affidavits at trial, however, because he believed that the prosecution's response would diminish the trial judge's assessment of Williams and thereby adversely affect the judge's sentencing decision. It is this conduct that, I believe, usurped Williams' Sixth Amendment right to exercise final judgment over the central strategic decision of his defense policy.

The record clearly indicates that Williams requested several times that the affidavits be used in his defense. Williams first showed his counsel the affidavits in December 1977. At the evidentiary hearing on this issue, Williams was asked whether he indicated to his counsel precisely how he wanted the affidavits to be used:

WILLIAMS: Yes, I had a specific defense in mind, and I presented them to him and told him I wanted him to use them in my defense to exonerate me.

QUESTION: What did he say?

WILLIAMS: He told me that a judge would bury me for something like this.

. . .

QUESTION: Did Mr. Goldberg at that time indicate he would not use these affidavits?

WILLIAMS: No, he didn't.

Just before trial, Williams again told his attorney to use the affidavits:

QUESTION: At that point in time did you indicate to Mr. Goldberg your desire to use these affidavits?

WILLIAMS: I did all the way through the trial.

QUESTION: And prior to the start of the trial did Mr. Goldberg definitively tell you he would not use these affidavits?

WILLIAMS: No, he did not.

Williams also testified that during the trial he once again specifically asked counsel to utilize the affidavits. According to Williams, his attorney replied that "he would take care of it, to leave it to him." Williams made it clear that if his counsel had unambiguously refused to use the affidavits he would have retained another attorney:

QUESTION: If Mr. Goldberg had told you prior to the start of your trial that he absolutely refused to use these affidavits, would you have continued having him as your counsel?

WILLIAMS: No.

During his testimony, Goldberg did not contradict Williams' statements. Indeed, his only comment on this matter indicated that he left open the decision whether to use the affidavits:

QUESTION: When you saw this affidavit, at least one of them, did Mr. Williams indicate that he would like that used in his defense?

GOLDBERG: He did.

QUESTION: At that time when you had your first meeting in New York, did you indicate to him definitively one way or the other what your intentions were concerning that affidavit?

GOLDBERG: I did not.

Nor did the prosecution produce any other witness to testify that Williams was advised that the affidavits would not be introduced to impeach the Brooks' testimony.

---

1. 21 U.S.C. §§ 841(a)(1) & 843(b) (1976).

2. Majority opinion, *supra*, at 200.

3. Illustrative excerpts from the affidavits are included in the majority opinion. *Id.* at 200 n.1.

The majority asserts that "[a] fair reading of the record reveals that Williams was apprised in advance of trial of counsel's skepticism and reluctance to use the affidavits."[4] While I do not quarrel with this statement, I do not believe that counsel discharged his duty to Williams merely by informing him of his "skepticism and reluctance." As I maintain below, counsel had a duty either to comply with Williams' directive or definitively to inform Williams that he would not use the affidavits and, if Williams insisted, to resign as trial counsel.[5]

Williams acknowledges that counsel expressed reluctance to introduce the affidavits into evidence, but insists that counsel continuously put him off whenever he asked for a definite answer. The majority argues that Williams "knew that his counsel would not seek to impeach the Brookses with the affidavits once they did testify for the Government."[6] The only support for this assertion, however, is the following statement by counsel:

> I withheld judgment on whether I would use the document indicating to Mr. Williams that the execution of these documents was important to me only to the extent that they may indicate that perhaps the Brookses wouldn't testify for the government.[7]

As I read this testimony, counsel was merely reiterating his reluctance to use the affidavits. The fact that the affidavits were important to counsel only to the extent that they might reveal whether the Brookses would testify for the prosecution does not indicate in any way that he would not abide by that which was requested by, and clearly important to, Williams—namely, that the affidavits be used in cross-examining the Brookses. This is particularly true in view of counsel's prefacing comment that he "withheld judgment on whether to use the document[s]." Accordingly, there is no basis for the majority's claim that this

testimony contradicts Williams' repeated assertions that counsel never definitively told him that the affidavits would not be employed.[8]

In sum, the record before us establishes that (1) before and during trial Williams pressed his counsel to introduce affidavits that on their face impeached the testimony of the prosecution's two most important witnesses; (2) the attorney continually avoided telling Williams definitively whether he would use the affidavits; (3) prior to trial Williams was not told that his counsel would not comply with his decision to use the affidavits; (4) counsel's response to Williams' final demand, made during the trial, that the affidavits be used was that counsel "would take care of it, to leave it to him"; and (5) despite Williams' repeated assertions of his strong desire to use the affidavits—which contradicted the most important testimony in the prosecution's case—they were never introduced into evidence. In view of this testimony, I conclude that counsel misled Williams on a matter central to defense strategy, effectively overstepped his role as Williams' representative, and accordingly abridged Williams' right to have final say over this most important decision of defense strategy.

## II.

Although the Supreme Court has not as yet explicitly interpreted the Sixth Amendment as affording defendants in criminal proceedings the right to exercise final decisionmaking authority over certain basic questions of defense policy, the logic of several of its decisions, in my view, strongly suggests such a construction.

In *Faretta v. California*,[9] the Supreme Court construed the Sixth Amendment as affording not only the right to counsel, but also the right not to be so assisted. The right to self-representation, the Court held,

4. Majority opinion, *supra*, at 203.

5. Part II *infra*.

6. Majority opinion, *supra*, at 203.

7. *Id.* (emphasis partially deleted).

8. *See id.*

9. 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

is "necessarily implied by the structure of the Amendment. The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails." [10] The Court emphasized that the right is to have "the 'assistance' of counsel, and an assistant, however expert, is still an assistant. . . . To thrust counsel upon the accused, against his considered wish, thus violates the logic of the Amendment. In such a case, counsel is not an assistant, but a master; and the right to make a defense is stripped of the personal character upon which the Amendment insists." [11]

While *Faretta* did not hold that an accused who chooses to be assisted by counsel has a constitutional right nevertheless to exert final say over certain matters of defense policy, I believe its language and rationale support such an interpretation. In *Faretta*, the Court acknowledged that "when a defendant chooses to have a lawyer manage and present his case, law and tradition may allocate to the counsel the power to make binding decisions of trial strategy in many areas." [12] The Court qualified this assertion, however, with a citation to a line of habeas corpus cases dealing with the question whether counsel could unilaterally waive a claim or right, or whether the defendant must have participated in the decision in order to make the waiver effective. [13]

One case to which the *Faretta* Court referred is *Brookhart v. Janis*. [14] At the time of Brookhart's trial, Ohio employed a procedural rule that permitted a defendant in a criminal case to plead not guilty, while also agreeing not to contest the prosecution's prima facie case. This included waiver of the right to cross-examine prosecution witnesses. Against Brookhart's wishes, his counsel informed the trial judge that he would not contest the prosecution's prima facie case. Following his conviction, Brookhart sought habeas corpus relief in the Ohio courts. The United States Supreme Court granted certiorari "to determine whether Ohio denied [Brookhart's] constitutional right to be confronted with and to cross-examine the witnesses against him." [15] The Court held that counsel had no "power to enter a plea which is inconsistent with his client's expressed desire and thereby waive his client's constitutional right to plead not guilty and have a trial in which he can confront and cross-examine the witnesses against him." [16]

Although the narrow question in *Brookhart* was whether the attorney's decision to forego cross-examination should have been attributable to his client, the Court's opinion speaks in large part to the issue present here—whether the Sixth Amendment reserves to criminal defendants final authority over certain basic decisions of defense policy. Brookhart's counsel, the Court held, had no power to decide whether to forego all cross-examination of prosecution witnesses. In other words, authority over that decision was reserved to Brookhart by the confrontation clause of the Sixth Amendment as applied to the states by the Fourteenth Amendment. While "law and tradition may allocate to the counsel the power to make binding decisions of trial strategy in many areas," [17] I read *Brookhart* as reserving to a defendant, even one assisted by counsel, final say over a certain category of decisions. The question then is how to determine whether the decision at issue here —counsel's choice to override Williams' per-

10. *Id.* at 819–20, 95 S.Ct. at 2533 (footnote omitted).

11. *Id.* at 820, 95 S.Ct. at 2533 (footnote omitted).

12. *Id.*

13. *See Brookhart v. Janis*, 384 U.S. 1, 7–8, 86 S.Ct. 1245, 1248, 16 L.Ed.2d 314 (1966); *Henry v. Mississippi*, 379 U.S. 443, 451, 85 S.Ct. 564, 569, 13 L.Ed.2d 408 (1965); *Fay v. Noia*, 372 U.S. 391, 439, 83 S.Ct. 822, 849, 9 L.Ed.2d 837 (1963).

14. 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966).

15. *Id.* at 3, 86 S.Ct. at 1246.

16. *Id.* at 7, 86 S.Ct. at 1248.

17. *Faretta v. California*, 422 U.S. at 820, 95 S.Ct. at 2534.

sistent desire that the affidavits be used to cross-examine the Brookses—should be binding on Williams for purposes of his motion for a new trial, or whether the decision is one over which final authority ultimately rests with Williams unless he expressly delegates it to counsel.

Another case involving waiver in the habeas corpus context is pertinent to this question. In *United States ex rel. Bruno v. Herold*,[18] Judge Waterman writing in dissent enumerated three factors for courts to consider in deciding whether counsel's decision should bind his client. These are (1) "the nature of the right involved"; (2) "the opportunity for and possibility of meaningful consultation between counsel and the accused as to the best course to follow"; and (3) "the degree of actual strategy that entered into counsel's decision."[19] In my view, these factors are well-suited to the task of determining whether counsel overstepped his proper role and usurped Williams' retained authority in this case.

The first consideration is the nature of the right at stake. If the decision relates to a constitutional right, in most cases it should be made by the defendant. With only a few exceptions, the Supreme Court has held that a waiver of a constitutional right, to be valid, must be made by the accused personally, with knowledge both of the right and of the consequences of waiv-

er.[20] A defendant who chooses to be assisted by counsel certainly delegates some authority to his attorney. Yet, in my view, this line of cases strongly suggests that when the decision at issue potentially entails the waiver of a constitutional right it must be made by the defendant personally, or at least with his knowledge and approval, unless there are compelling reasons militating against consultation.

The decision not to use the affidavits in cross-examining the Brookses implicated one of Williams' constitutional rights—the right to be confronted with and to cross-examine witnesses testifying against him.[21] In most cases, the decision whether to cross-examine a particular witness must rest with counsel because there is no time for consultation and discussion between attorney and client following the witness' direct testimony. As Mr. Chief Justice Burger has observed, "The trial process simply does not permit the type of frequent and protracted interruptions which would be necessary if it were required that clients give knowing and intelligent approval to each of the myriad tactical decisions as a trial proceeds."[22] The decision at issue here, however, is not typical of most decisions regarding whether and how to cross-examine a witness. The two other factors set forth by Judge Waterman—time for consultation and nature of the decision involved—distinguish the situation here from the usual case..

---

18.  408 F.2d 125 (2d Cir. 1969), *cert. denied*, 397 U.S. 957, 90 S.Ct. 947, 25 L.Ed.2d 141 (1970).

19.  *Id.* at 138 (Waterman, J., dissenting) (citing Comment, *Criminal Waiver: The Requirements of Personal Participation, Competence, and Legitimate State Interest*, 54 Calif.L.Rev. 1262 (1966)). A fourth factor, "the degree of exceptional pressures or circumstances on either counsel or the accused which could dictate. a waiver," does not appear pertinent to the issue in this case.

20.  *See, e. g., Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) (right to have counsel present during questioning in custodial setting); *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (same); *Brookhart v. Janis*, 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966) (right to be confronted with and to cross-examine witnesses); *Fay v. Noia*, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963) (right to appeal); *Green v.*

*United States*, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957) (right not to be put in double jeopardy); *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938) (right to assistance of counsel in preparation and presentation of defense). *But see, e. g., Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976) (waiver of right not to be compelled to appear in court in prison clothes implied from failure to object); *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (proof of knowledge of right to refuse consent to search not required in order to prove voluntariness of consent).

21.  *Brookhart v. Janis*, 384 U.S. at 3, 86 S.Ct. at 1246.

22.  *Wainwright v. Sykes*, 433 U.S. 72, 93, 97 S.Ct. 2497, 2510, 53 L.Ed.2d 594 (1977) (Burger, C. J., concurring) (footnote omitted).

There was ample time here for consultation. Both Williams and his attorney knew of the affidavits long before trial and, indeed, had discussed on a number of occasions the advisability of using them for purposes of cross-examination. Counsel admits that he understood Williams' position. Williams forcefully and continuously expressed his desire that the affidavits be used, and his attorney has not pointed to any developments arising during the Brooks' testimony that might have required him to make a quick judgment, thereby explaining the unilateral nature of his decision to forego Williams' right of cross-examination.

In light of this, I believe there is little justification for permitting counsel, on his own and in disregard of his client's wishes, to waive the client's constitutional right. As Judges Wright and Sofaer have observed:

> There is no reason to give attorneys more power to waive defendants' rights than they need in order to represent their clients effectively. When the decision to be made does not require a speedy judgment or involve factors which are beyond the ordinary defendant's ability to understand, consultation should normally be necessary.
>
> \* \* \* \* \* \*
>
> Counsel's choice, made without consultation, is binding in matters involving trial strategy largely because of the need for a quick decision. If counsel was able to consult in a particular case, or the client able to express his preference, reliance on the rationale that there was a need for a quick decision is misplaced. This also is true where the client volunteers his desire before the tactical decision is made.[23]

Another factor pointed to by Judge Waterman relates to the magnitude and nature of the strategic decision at issue. The choice whether to use the affidavits was perhaps the most important defense decision in the case. As the majority notes, the testimony of the Brookses "was central to the government's case, and it is not seriously contended that Williams could have been convicted without it."[24] Hence, even though use of the affidavits might not have been Williams' only possible means of defense,[25] the decision whether to use them went to the heart of the defense's strategy—impugning the credibility of the Brookses. The decision not to use the affidavits on cross-examination thus is more akin, as I see it, to the decision in *Brookhart* to forego all cross-examination than it is to the decision often made at trial whether to call or to cross-examine a particular witness.[26]

The reasons underlying the choice not to utilize the affidavits also militate against permitting counsel to make the choice for Williams and against his wishes. Decisions that primarily involve the exercise of legal judgment—such as whether to ask or to object to a particular question—generally should be left to the attorney's sound judgment because consultation with the accused would not significantly increase the likelihood that the decision is in the best interests of the accused. In contrast, Williams' attorney chose not to use the affidavits because he believed that the prosecution's response would damage Williams' already slight chances of acquittal and would adversely influence the judge's assessment of the appropriate sentence. Thus, the decision implicated not merely legal judgment

---

**23.** Wright & Sofaer, *Federal Habeas Corpus For State Prisoners: The Allocation of Fact-Finding Responsibility*, 75 Yale L.J. 895, 973, 975 (1966). At the time of publication of the article, Judge Sofaer was a law clerk to Judge Wright.

**24.** Majority opinion, *supra*, at 200.

**25.** *See id.* at 202–203.

**26.** One commentator has suggested that "a lawyer is permitted to make relatively minor and understandable mistakes on behalf of his client, but not major and inexcusable ones. The question of agency will thus turn on an assessment of the significance of a procedural right to the proper defense of an accused." Tigar, *The Supreme Court, 1969 Term—Foreword: Waiver of Constitutional Rights: Disquiet in the Citadel*, 84 Harv.L.Rev. 1, 18 (1970).

regarding the probability of success, but also an assessment of the palatability of the various possible results of the decision. Inasmuch as it is Williams who must live with the consequences, the "correctness" of the determination depends primarily on Williams' own values, rather than on counsel's legal assessment of the risks. Under these circumstances, the appropriate decisionmaker is Williams. Certainly, the decision should not be made against his wishes or to his exclusion. Rather, counsel's proper role would have been to describe the choices and risks to him in comprehensible terms. Once Williams decided to use the affidavits, counsel's duty was to implement the decision.[27] By arguing with Williams up until the time of trial and assuring Williams that he "would take care of it," counsel denied Williams the opportunity to decide whether to go along with the decision or to obtain

counsel who would comply with his wishes.[28] By then acting contrary to Williams' express desires, the attorney overstepped his proper role and infringed Williams' own prerogatives. I would conclude that such behavior violated Williams' Sixth Amendment right to have counsel of his choice and to exercise final authority over this type of basic policy decision.[29]

### III.

Even if Williams had been fully informed of and acceded to his attorney's decision not to use the affidavits, it would appear that he was denied effective assistance by counsel's failure independently to investigate the facts underlying the reasons for the decision.

Williams' attorney chose not to use the affidavits because an Assistant United

---

**27.** See White, *Federal Habeas Corpus: The Impact of the Failure to Assert a Constitutional Claim a Trial*, 58 Va.L.Rev. 67, 74 (1972).

**28.** For this reason, I do not believe that Williams waived his right to be represented by counsel who would implement his decision regarding the affidavits. Until Williams knew that the attorney definitely would not use the affidavits, there was no reason for Williams to have to decide whether to discharge counsel or merely to acquiesce in the attorney's refusal. Indeed, counsel may well have misled Williams to assuring him just before trial that he "would take care of the affidavits, to leave it to him." Circumstances such as these, in my view, prevented Williams from waiving his constitutional right to be represented by an attorney who would abide by his choice of defense strategy.

**29.** Independent of the Sixth Amendment basis for the conclusion that Williams' attorney overstepped his authority, it also would appear that counsel breached ethical consideration 7–8 of the Code of Responsibility of the Pennsylvania Supreme Court, which provides in pertinent part:

A lawyer should advise his client of the possible effect of each legal alternative. A lawyer should bring to bear upon this decisionmaking process the fullness of his experience as well as his objective viewpoint. In assisting his client to reach a proper decision, it is often desirable for a lawyer to point out those factors which may lead to a decision that is morally just as well as legally permissible. He may emphasize the possibility of harsh consequences that might result from assertion of legally permissible positions. In

the final analysis, however, the lawyer should always remember that the decision whether to forego legally available objectives or methods because of non-legal factors is ultimately for the client and not for himself. 42 Pa.Cons.Stat.Ann. EC 7–8 (Purdon's 1975). See also Discussion Draft of ABA Model Rules of Professional Conduct, 48 U.S.L.W. No. 32 (Feb. 19, 1980), at 3–4:

1.3 *CLIENT AUTONOMY*

(a) A lawyer shall accept a client's decisions concerning the objectives of the representation and the means by which they are to be pursued except as stated in paragraphs (b) and (c).

\* \* \* \* \* \*

(c) The lawyer may decline to pursue a lawful course of action pursuant to rule 1.5(b), and, if the client insists upon such course of action, the lawyer may withdraw from representation subject to the provisions of rule 1.16.

\* \* \* \* \* \*

1.5 *DILIGENCE*

\* \* \* \* \* \*

(b) A lawyer may decline to pursue a course of action on behalf of a client that the lawyer considers repugnant or imprudent although in conformity with law if:

(1) Before undertaking the representation the lawyer adequately discloses the intention so to limit assistance in specified respects; or

(2) During the representation an occasion arises for so limiting assistance, the lawyer adequately explains to the client the alternative that the lawyer desires not to follow, and the client consents to the limitation.

States Attorney told him that the prosecution was prepared to prove that the affidavits were executed under duress resulting from Williams' threats to harm the Brookses and their children. Counsel stated that, in his opinion, such evidence might cause the judge to impose a longer sentence than he would had he not learned of the alleged coercion. While this tactical decision might well be justified had Williams consented and if the prosecution's assertion of duress were true, the record demonstrates unequivocally that counsel made no attempt to determine the validity of the prosecution's claim:

QUESTION: Did you ever make an attempt to interview the Brookses?

GOLDBERG: I did not.

QUESTION: Did you ever make an attempt to interview the notary to determine whether or not the Brookses came freely or came under threat?

GOLDBERG: I did not.

QUESTION: Did you ever make an attempt to interview any of the witnesses who witnessed these affidavits?

GOLDBERG: I did not.

QUESTION: Don't you think that would have been important to determine whether or not they were true?

GOLDBERG: No.

QUESTION: Did you ever discuss with Mr. Williams these threats?

GOLDBERG: Yes.

QUESTION: Did he still say that he wanted to use these affidavits?

GOLDBERG: He denied at all times any threats and said that he wanted the statements used.

QUESTION: So, in other words, you believed the government and disbelieved your own client?

GOLDBERG: I relied upon the government's representation to me that this would be the proof that would come in once the door was opened, and I applied my knowledge of the case in totality, considering the photographic evidence,

the surveillance by a team of Allegheny County Police Officers and DEA agents, the tape recordings, and then matched the sum of all these things against a document that I felt did not have the ring of truth, but I withheld judgment on whether I would use the document indicating to Mr. Williams that the execution of these documents was important to me only to the extent that they may indicate that perhaps the Brookses wouldn't testify for the government.

Yet, when asked whether he had seen any surveillance pictures of Williams, his attorney replied:

I don't believe I saw any pictures of Fletcher Williams physically, although there might have been a Polaroid camera shot. There might have been, I don't have a recollection.

Moreover, there is nothing in the transcript of the telephone conversations between Williams and Pearl Brooks, as I read it, to justify counsel's conclusion that the conversations "had the ring of a narcotic transaction" and therefore corroborated the Brooks' trial testimony.[30] And, despite the prosecution's assertion that Williams threatened the Brooks' children, the attorney apparently did not even know whether the Brookses in fact had children:

QUESTION: Do you know whether or not the Brookses have any children?

GOLDBERG: Don't know.

QUESTION: Don't you think that would have been important to know at the time you were going to determine whether or not to use these affidavits?

GOLDBERG: No.

The duty of counsel to investigate the facts in preparing a defense is well-established. In *Moore v. United States*,[31] for example, we held that, to be an effective legal assistant, counsel must investigate the facts underlying his client's case:

---

**30.** The transcript of the telephone conversation is reproduced in the appendix to this opinion, *infra*.

**31.** 432 F.2d 730 (3d Cir. 1970) (in banc).

[R]epresentation involves more than the courtroom conduct of the advocate. The exercise of the utmost skill during the trial is not enough if counsel has neglected the necessary investigation and preparation of the case or failed to interview essential witnesses *or to arrange for their attendance*.[32]

And most recently, in the course of ordering the district court to conduct an evidentiary hearing on a claim of ineffective assistance of counsel, we held that "the failure to investigate a critical source of potentially exculpatory evidence may present a case of constitutionally defective representation."[33]

The duty to investigate is also prescribed by the American Bar Association's Standards for the Defense Function. Section 4.1 provides:

> Duty to investigate.
>
> It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to guilt and degree of guilt or penalty. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or his stated desire to plead guilty.[34]

In my view, the record demonstrates that Williams' counsel breached his duty to investigate. He testified that he based his decision not to use the affidavits on representations made by the prosecuting attorney that they were executed under duress, and that he did not conduct any independent investigation to determine the validity of the prosecution's claims. The attorney attempted to justify his inaction by stating that other indicia of Williams' guilt persuaded him that the Brooks' affidavits indeed were coerced. Yet, counsel conceded that he could not recall viewing the photographs that allegedly inculpated Williams, and, as stated above, I do not believe that an objective reading of the transcripts of Williams' telephone conversations with Pearl Brooks justifies the attorney's conclusion that they "had the ring of a narcotic transaction."

Without interviewing the Brookses, or at least in some way checking the veracity of the prosecution's version of the circumstances surrounding the Brooks' recantation, there was no way for Williams' counsel effectively to cross-examine them. In contrast, some form of independent investigation into the validity of the prosecutor's claim that Williams coerced the affidavits may have persuaded counsel that the prosecution could not prove duress. Inasmuch as such a determination may well have led to a decision to use the affidavits, and because cross-examination of the Brookses was the only real means of defense open to Williams, I conclude that he was prejudiced by counsel's ineffectiveness. Accordingly, I

---

32. *Id.* at 739 (footnote omitted). Several other courts of appeals have adopted the same standard. *United States v. Decoster,* 624 F.2d 196, at 209 (D.C.Cir.1979) (en banc) (plurality opinion) ("The duty to investigate is a subset of the overall duty of defense counsel. . . . As part of this process, witnesses who may have information relevant to the case should be identified and interviewed."), *cert. denied,* 444 U.S. 944, 100 S.Ct. 302, 62 L.Ed.2d 311 (1979); *Wolfs v. Britton,* 509 F.2d 304, 309 (8th Cir. 1975) ("we cannot minimize the fact that effective assistance refers not only to forensic skills but to painstaking investigation in preparation for trial"); *Coles v. Peyton,* 389 F.2d 224, 226 (4th Cir.) ("Counsel must conduct appropriate investigations, both factual and legal, to determine if matters of defense can be developed"), *cert. denied,* 393 U.S. 849, 89 S.Ct. 80, 21 L.Ed.2d 120 (1968). *Cf. Woodruff v. Tomlin,* 616 F.2d 924, at 934 (6th Cir. 1980) (en banc) (reinstating jury verdict for plaintiff in legal malpractice claim): "While the determination of whether to call a particular person as a witness at trial is a tactical decision involving the exercise of professional judgment, the same cannot be said concerning the failure to interview a potential witness brought to the attention of an attorney by his client."

33. *United States v. Baynes,* 622 F.2d 66, at 69 (3rd Cir. 1980) (per curiam).

34. ABA Standards, The Defense Function § 4.1 (1971), *quoted in United States v. Baynes,* 622 F.2d 66, at 69 (3rd Cir. 1980) (per curiam).

would reverse Williams' conviction on grounds of ineffective assistance of counsel, as well as for the reasons stated in part II of this opinion.

## APPENDIX TO DISSENTING OPINION OF JUDGE ADAMS

### U.S.A. v. WILLIAMS

#### No. 79–2237

THE FOLLOWING TELEPHONE CONVERSATION WAS MADE BY SD260014 TO TELEPHONE NUMBER 412–471–0246, FLETCHER WILLIAMS, AT APPROXIMATELY 11:35 A.M. ON OCTOBER 6, 1976, FROM A PRIVATE TELEPHONE AT THE PITTSBURGH DISTRICT OFFICE REGARDING THE PURCHASE OF EXHIBIT # 1

JEANETTE: Hello

SD260014: Hello Jeanette

JEANETTE: Uh huh

SD260014: Fletcher there?

JEANETTE: No he isn't

SD260014: You know when he'll be back?

Fletcher WILLIAMS: Hello.

JEANETTE: That might be him

WILLIAMS: Yea, what's up?

#### JEANETTE HANGS UP

SD260014: Yea, what's up?

WILLIAMS: I'm getting ready to do that now.

SD260014: Gettin ready to do that now?

WILLIAMS: Yea, I'm coming your way, you got—get that counted for me.

SD260014: You know who this is?

WILLIAMS: Huh?

SD260014: You know who this is?

WILLIAMS: Thought it was Mildred at first.

SD260014: No.

WILLIAMS: Tell me about it.

SD260014: This is Pearl.

WILLIAMS: What's happening?

SD260014: That's what I want to know.

SD260014: The people from Erie here.

WILLIAMS: What about them?

SD260014: They got $700

Kelly's talking to them. He told me to come and call you.

WILLIAMS: Well where's he at?

SD260014: Talkin with them—across the street.

WILLIAMS: Well what they want?

SD260014: They got 700

WILLIAMS: Well tell him to call me.

SD260014: You always say don't talk

WILLIAMS: I don't want to talk that's the reason ain't no—that's what I'm sayin now.

SD260014: Ha oh

Well

WILLIAMS: He have to come over here

SD260014: How long you gonna be home?

WILLIAMS: I'll be gone for about 35 minutes. I'll be right back.

SD260014: 35 minutes?

WILLIAMS: Just tell him to come this direction.

SD260014: Alrighty we'll be over.

WILLIAMS: Alright bye

SD260014: Bye

#### END OF CALL

THE FOLLOWING TELEPHONE CONVERSATION WAS MADE BY SD260014 TO TELEPHONE NUMBER 412–471–0246, FLETCHER WILLIAMS, FROM A PRIVATE TELEPHONE AT THE PITTSBURGH DISTRICT OFFICE ON OCTOBER 27, 1976 AT APPROXIMATELY 5:00 P.M.

Fletcher WILLIAMS: Hello.

SD260014: Hello is Fletcher there?

WILLIAMS: Speaking

SD260014: Hey Fletch

WILLIAMS: Yea

SD260014: What's up?

WILLIAMS: Who is this?

SD260014: Pearl

WILLIAMS: Nothin, nothin but trouble.

SD260014: Ah I wanted to talk to you. Remember I told you about them washin machines I wanted to get

**214**

WILLIAMS: Yea

SD260014: Yea. I wanted to know if I could talk to you

WILLIAMS: No ain't nothin happenin

SD260014: Uh. Alrighty then
You all know about when

WILLIAMS: Hum
Not really. Takin it light

SD260014: Alrighty.

WILLIAMS: Later

SD260014: Bye

END OF CALL

THE FOLLOWING TELEPHONE CON-VERSATION WAS MADE BY SD260014's HUSBAND TO TELE-PHONE NUMBER (412) 471–0246, FLETCHER WILLIAMS, FROM A PRIVATE TELEPHONE AT THE PITTSBURGH DISTRICT OFFICE ON NOVEMBER 6, 1976 AT AP-PROXIMATELY 4:00 P.M. REGARD-ING THE PURCHASE OF EXHIBIT # 2.

Fletcher WILLIAMS: Hello.

SD260014's husband: Hey, me again. Ah on those washers

WILLIAMS: Yea

SD260014's husband: Three

WILLIAMS: What time?

SD260014's husband: Next half an hour Jimmy

WILLIAMS: You call me from Shirley's Bar and then you meet down by Vivi-an's house, the old house.

SD260014's husband: Okay.

WILLIAMS: You call from there when you get up there.

SD260014's husband: Alright me and Pearl will be together.

WILLIAMS: Later

SD260014's husband: Later

END OF CALL