UNITED STATES of America

v.

ALESSANDRELLO, Gaetano, Appellant in No. 79–2654.

Appeal of LACOGNATA, Salvatore, in No. 79–2699.

Nos. 79–2654, 79–2699.

United States Court of Appeals, Third Circuit.

Argued July 10, 1980.

Decided Nov. 21, 1980.

Kenneth J. Fishman (argued), James Michael Merberg, Law Offices of F. Lee Bailey, Boston, Mass., for appellants.

Robert J. Del Tufo, U. S. Atty., William Braniff, Chief, Crim. Div. of U. S. Attorney's Office, Samuel A. Alito, Jr., Asst. U. S. Atty. (argued), Newark, N. J., for appellee.

Before WEIS, VAN DUSEN and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Senior Circuit Judge.

On October 6, 1979, Gaetano Alessandrello and Salvatore Lacognata were convicted of violating the federal bank robbery statute, 18 U.S.C. § 2113(a), (b), and (e) (1976), and the conspiracy statute, 18 U.S.C. § 371 (1976). They challenge their convictions on appeal, asserting that their rights were violated by their exclusion from a portion of the jury selection process. They also contend that there was insufficient evidence that they took money which was in the control of a bank from the person or presence of another. They further argue that there was insufficient evidence of intent to rob a bank. Finally, they allege that the trial court erred in denying their request for an indefinite continuance, and in admitting certain items into evidence. After reviewing the record in this case in light of the applicable law, we affirm.

## I.

Alessandrello and Lacognata were charged in a four-count indictment returned August 6, 1979. Three others were named as co-conspirators and co-defendants.[1] Count One charged the defendants with conspiring to rob a bank in violation of 18 U.S.C. § 2113(a), (b), and (e). Count Two charged the defendants with using force and violence in robbing a bank. 18 U.S.C. § 2113(a). Count Three charged them with taking and carrying away with intent to steal money in the control of a bank. 18 U.S.C. § 2113(b). Count Four charged them with forcing a person to accompany them in committing the above offenses. 18 U.S.C. § 2113(e). The evidence adduced at trial, through 45 Government witnesses, including one co-conspirator, showed that Alessandrello and Lacognata planned the criminal venture and enlisted three acquaintances to help execute it. On July 20, 1979, three of the co-conspirators went to the Dedrick family home in Newfoundland, New Jersey, and forcibly removed Joan Dedrick from the house. They bound and blindfolded her, placed her in a box, and drove her to the apartment of one of the co-conspirators. They then asked for her husband's telephone number at the bank. William Dedrick, executive vice-president of the Franklin Bank in Paterson, New Jersey, received a telephone call from them on his private office line. He was told that his wife was being held, and heard her voice briefly. He was then told to get $150,000 in small, unmarked bills and take it to a telephone booth across the street from the bank

---

1. The three co-defendants each entered guilty pleas to Counts One and Two. Shortly before trial, Jose Abraham Fonseca-Vasquez entered his guilty plea. Guillermo Jesus Caceres-Novella and Angel Humberto Cedeno-Echeverria went to trial with Alessandrello and Lacognata, but on the third day of trial they changed their pleas from not guilty to guilty.

in 15 minutes. Dedrick went to the designated booth and received a call directing him to another phone booth. At the second booth he received a call telling him there were too many police officers in the area. Dedrick returned to the bank. A few hours later he received another telephone call and was instructed to get $300,000. When he protested that there was not that much money in the bank, the caller reiterated the larger amount and threatened to kill Dedrick's wife if he did not deliver the money. The next day Dedrick received another phone call. He was told to place the money in a shopping bag inside a briefcase and wait for further instructions. Dedrick stuffed $217,000 into a suitcase and a bag. Shortly thereafter, he was directed to take the money to a telephone booth at a certain location in New York City. He complied; at that booth he was called and told to proceed to another phone booth. After a series of similar steps, he was finally directed back to New Jersey and ordered to leave the money in a wooded area in Fort Lee. He did so, and returned to his home. Approximately one and one-half hours later the money was retrieved from the wooded area by the defendants. Mrs. Dedrick was released, still blindfolded, at a gas station in Teaneck, New Jersey. The defendants were arrested a short time later.

The trial commenced on September 25, 1979. A jury was selected and sequestered. The Government began presenting testimony on September 26 and rested on October 5. The defendants moved for judgments of acquittal on each count. After the motions were denied, the defendants rested without presenting any evidence. The case was submitted to the jury on October 6. That evening the jury returned verdicts of guilty against both defendants on each count. On November 9, the defendants were each sentenced to a five-year prison term on Count One and a concurrent general term of 21 years on Counts Two, Three and Four. It is from these judgments that they appeal.

## II.

The defendants' chief argument on appeal is that they were improperly excluded from a portion of the jury selection proceedings. These proceedings were handled in the following manner. The trial judge first addressed the pool of approximately 80 prospective jurors. He introduced all the attorneys and the defendants, and then explained the basic functions of the jury, prosecution, and defense in a criminal trial. After some further remarks about the Government's burden of proof, he described and explained the indictment. The first 16 prospective jurors were called and placed in the jury box. One at a time, each of them stood up and disclosed the following information: name; years of residence at current address; employer; length of employment; marital status; spouse's occupation, spouse's employer, length of spouse's employment; children; children's occupation and place of employment; homeowner status; hobbies or recreational interests; and level of education. The judge then continued the *voir dire* by posing a number of general questions to the group of 16. He asked whether any of them (1) recognized any of the defendants, attorneys, or law firms involved in the trial, (2) had ever served on a grand jury, (3) had ever served on a trial jury, (4) had ever been a witness in a criminal case, (5) had ever been a victim of a crime or was closely related to someone who had been a victim of a crime, (6) had ever been accused of a crime or was closely related to someone who had been accused of a crime, (7) had ever been employed by a law enforcement agency or was closely related to someone who had been so employed, (8) had ever been employed by the Government or was closely related to someone who had been a Government employee, (9) had any pending disputes with the Federal Government, and (10) had heard anything about this case.

Any of the prospective jurors who answered the first nine questions in the affirmative were asked follow-up questions by the judge. The judge then explained certain fundamental legal principles, such as the presumption of innocence, the requirement that each defendant be found guilty beyond a reasonable doubt, the ab-

sence of any evidentiary weight to be given to the charges and content of the indictment, etc., and questioned the prospective jurors to ensure that they could apply these principles. The judge concluded this portion of the *voir dire* by describing the predicted trial length of three to four weeks, the schedule of six court sessions per week, and the restrictions upon a sequestered jury. He explained that he wanted to ask a few further questions of each prospective juror, individually, in a small room adjoining the courtroom. He advised the group that anyone who wished to be excused from jury duty due to severe personal hardship should offer his or her excuse in the anteroom adjoining the courtroom. Up to this point, all the defendants, as well as their attorneys, were present during *voir dire.* They saw each prospective juror, and heard each question and answer.[2]

The judge then retired to the small anteroom, accompanied by the prosecutors and defense attorneys. He explained that he wished to examine prospective jurors individually on the matter of pre–trial publicity. He stated that he wished to avoid the possibility, which never took place, of having one person blurt out something prejudicial in front of the group of prospective jurors, thereby tainting all 15 other prospective jurors. The defense attorneys objected to this procedure, stating that the defendants should be present. The judge responded that the room was so small that there was not enough room for the four defendants.[3] He told the defense attorneys

that they were free to go out and consult with their clients as often and as long as they wished. He added that they would also have an ample opportunity after the jury pool was selected to consult with the defendants before advancing challenges for cause or peremptory challenges. While the defendants remained in the courtroom approximately 25 feet away,[4] the judge conducted this portion of the *voir dire.* Prospective jurors entered the anteroom one by one. The judge asked each of them several questions concerning his or her exposure to pre–trial publicity, as well as the effect of such exposure on the juror, and each juror was permitted to request being excused from serving on a sequestered jury during a trial estimated to last three or four weeks.[5]

After all 16 had been examined on this topic, the judge and attorneys returned to the courtroom.[6] There, again in the presence of the defendants, another 16 prospective jurors were called and placed in the jury box. The *voir dire* proceeded as before. Each individual answered specific questions about himself. The judge asked the whole group certain general questions related to the particular case, and explained some basic legal principles. The topic of pre–trial publicity again was explored in the anteroom. The same procedure was followed a third time, with a third group of 16 prospective jurors.

After approximately 40 individuals had been found competent to sit as jurors in this

---

2. These clear, preliminary instructions to the approximately 48 prospective jurors examined on the *voir dire* took place on September 25, 1979, and appear at N.T. 2–21 of Document 38 in Crim. No. 79–269, D.N.J., whereas the quotation from the appendix at note 1 of the dissenting opinion is from the record of a statement made on September 26 by the trial judge to the attorneys when the jury was not present, explaining his rulings on the previous day.

3. At this point, there were four defendants. Two pleaded guilty during trial. See note 1, *supra.*

4. Trial transcript, September 26, 1979, at 16 (Document 34 of Crim. No. 79–269, D.N.J.).

5. The transcript reveals that many knew nothing about the crime. Some had not even heard of it; a number had seen some headlines, but nothing more. Trial transcript, September 25, 1979, at 54–95, 120–53, 181–214 (Document 38 of Crim. No. 79–269, D.N.J.).

6. After each prospective juror was questioned about pre–trial publicity, he was asked if he could serve as an impartial juror in this case. Those who answered affirmatively, and who were not excused for personal hardship reasons, were told they would be one of the final 40 from which the trial jury would be selected. They were directed to wait in another courtroom until the actual selection took place. See, *e. g.,* trial transcript, September 25, 1979, at 54.

case, the Government and the defense agreed upon the 16 who would sit as jurors and alternates. No challenges for cause were advanced at the end of the September 25, 1979, court day; peremptory challenges were not formally exercised.[7]

When court convened the next morning (September 26, 1979), the court said to counsel for the defendants (N.T. 10 and 14 of Document 34 in Crim. No. 79–269, D.N. J.):

"THE COURT: You had some motions yesterday with respect to the jury. You mentioned those in chambers, you mentioned some of them as to the jurors being selected. I think if you want to preserve that you ought to put it on the record. . . .

.    .    .    .    . .

"MR. HOROWITZ: We objected to the procedure whereby individual members of the jury panel were interviewed by Your Honor in the anteroom outside the courtroom, outside of the presence of the defendants. The reason for that is that the defendants are entitled to exercise peremptory challenges. A peremptory challenge can be based on anything, it can be based on a gut feeling, an innate distrust, whatever. Your Honor knows. For my client not to have had the opportunity to see each and every one of those jurors as they answered the questions at close range, if you will, more pointed questions than were–and alone, as distinguished from being a member of a panel and sitting in the box in a large room, it deprived them of the opportunity to see that, to get that feeling and to communicate that to counsel, which of those jurors he would prefer having or not having."

It was immediately after this portion of the record that the trial judge and counsel for the defendants–appellants had the colloquy

---

7. The transcript of the agreement joined in by all counsel at the end of the September 25, 1979, court day, as stated by the trial judge, was as follows:

"THE COURT: . . .

"Let me read off these numbers on the record and names, if I can read my writing. If I don't give the name right, you please correct me.

"These are the sixteen agreed upon: 8192, McCabe; 8235, Cronk; 8408, Cornelius; 8133, Moyer; 8372, O'Rourke; 8436, Makar; 8438, Scruggs; 8391, Martz; 8215, Bjerklie; 8366, Caruso; 8134, Cherry; 8052, Bright; 8144, Scarentino; 8161, Keyes; 8449, Dolahan; and 8461, Reilly.

"(The following takes place in open court.)

"THE COURT: Could I go on the record for a moment, gentlemen.

"We have put on the record, after interrogating some, what, forty–eight jurors, counsel have agreed upon sixteen jurors. We will put Mr. Caruso in No. 1 seat since he has a slight hearing problem, although it does not seem to be too serious, because he understood everything.

"We'll put the rest of the jurors in as Mr. Towers [Clerk] calls them. At the end of the case we will select the deciding twelve by lot. We'll put the number of jurors left, sixteen, fifteen, thirteen, whatever, in the benches, we'll pull twelve numbers by lot and they will be the deciding jurors.

"Are we all agreed?

"MR. BRANIFF: Yes.

"MR. HOROWITZ: Yes.

"THE COURT: We agreed on the names and numbers. I read off a moment ago who they were at sidebar.

"You've checked with your clients and it meets with their concurrence, defense counsel?

"MR. HOROWITZ: Yes.

"MR. SMITH: Yes.

"MR. PANNULLO: Yes.

"MR. BARONE: Yes."

(See N.T. 218–19 of Document 38 in Crim. No. 79–269, D.N.J.).

The above 16 jurors were then brought into the courtroom and the trial judge addressed them as follows:

"What we are going to do is this: At the conclusion of the case twelve of you people who will decide this case will be selected by lot. We'll put sixteen jurors, or if anyone is excused, the remainder in the benches, we'll pick twelve names and numbers out of the roll box. Those twelve will be the deciding jury.

"I tell you this because that means that each one of the sixteen of you has an equal chance to be on the deciding twelve. Therefore, you should pay strict attention to the proceedings and to the evidence.

"If at any time you don't hear please raise your hand and I could have the question read back."

See *id.* at 222–23. See also trial transcript, September 26, 1979, at 21 and 41–42 (Document 34 at Crim. No. 79–269, D.N.J.).

quoted at pages 148, 149 of the dissenting opinion.

There is no basis in this record for the inference raised by the dissent at page 150 that anything that was said by any juror during the *voir dire* in this case "would provide an argument that an entire group has been contaminated by what [a] juror has said." Also, neither the prospective female juror (Richardson), referred to at page 150 of the dissent, nor prospective juror No. 4 (Williams), whose testimony is quoted at page 150 of the dissent, were ultimately members of the jury or alternates (see N.T. 67 of Document 34 in Crim. No. 79–269, D.N.J.). The fears of the dissent are wholly based on what might happen in other cases and not any prejudice suffered by the defendants in this case. Even though the dissent states that there were "persistent issues of credibility as to the prospective jurors," all counsel agreed on the composition of the jury except for the alleged objection to the absence of the defendants from a small portion of the *voir dire* without even making a record of the number of peremptory challenges exercised. By announcing in this opinion that Criminal Rule 43 (see page 138 below) must be strictly followed in this Circuit, we accomplish the beneficent purposes of that Rule's requirement that the defendant be present at all stages of the trial, including the impaneling of the jury. See note 24 below.

### A.

Alessandrello and Lacognata contend that their absence during a portion of the *voir dire* violated their right to a fair trial. They claim that all defendants have a fundamental right to be present at all stages of the trial, including the impaneling of a jury. They assert that this right has a basis both in the Federal Rules of Criminal Procedure and in the Constitution. The defendants first argue that they have a due process right to be present during jury impaneling.[8] The Supreme Court has not addressed the precise question of whether this right is an element of due process guaranteed by the Fifth Amendment.[9] It has, however, stated recently that a defendant only has a constitutional right to be present at stages of the trial where fundamental fairness might be thwarted by his absence. *Faretta v. California*, 422 U.S. 806, 816, 95 S.Ct. 2525, 2531,

---

**8.** Many of the cases concerning the right to be present at trial are based on the Sixth Amendment guarantee that a defendant may confront witnesses against him. *See, e. g., Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970); *Snyder v. Massachusetts*, 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934); *United States v. Toliver*, 541 F.2d 958, 964 (2d Cir. 1976); *United States v. Ruiz–Estrella*, 481 F.2d 723, 725–26 (2d Cir. 1973). Since no witnesses are involved in jury impaneling, the Sixth Amendment Confrontation Clause is inapplicable. The Due Process Clause of the Fourteenth Amendment is also inapplicable because it restrains actions taken by the states, whereas defendants were tried in federal court.

**9.** *Hopt v. Utah*, 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262 (1884), and *Lewis v. United States*, 146 U.S. 370, 13 S.Ct. 136, 36 L.Ed. 1011 (1892), are often incorrectly cited for the proposition that there is a constitutional right to presence during jury selection. *Hopt* concerned a violation of a statute which outlined a certain procedure for determining challenges for cause, 110 U.S. at 576, 4 S.Ct. at 203. *Lewis* reversed a conviction because the defendant was not present until after the jury had been selected. 146 U.S. at 375–76, 13 S.Ct. at 138. The often quoted dictum of *Lewis* that "after indictment found, nothing shall be done in the absence of the prisoner," *id.* at 372, 13 S.Ct. at 137, was expressly described by Justice Cardozo in *Snyder v. Massachusetts*, 291 U.S. 97, 117, 54 S.Ct. 330, 336, 78 L.Ed. 674 (1934), as based on the common law privilege of presence and not on the Constitution.

In *Fillippon v. Albion Vein Slate Co.*, 250 U.S. 76, 39 S.Ct. 435, 63 L.Ed. 853 (1919), and *Shields v. United States*, 273 U.S. 583, 47 S.Ct. 478, 71 L.Ed. 787 (1927), the Supreme Court reversed judgments based on the violation of the defendant's right "to be present in person or by counsel at all proceedings from the time the jury is impaneled until it is discharged after rendering the verdict." *Fillippon*, 250 U.S. at 81, 39 S.Ct. at 436. In both cases the Court declined to characterize the right as one encompassed within due process. Rather, the Court described it as a rule of orderly conduct of a trial by jury. *Id.* at 81, 39 S.Ct. at 436; *Shields*, 273 U.S. at 589, 47 S.Ct. at 479. The Supreme Court recently referred to this nonconstitutional rule in *Rogers v. United States*, 422 U.S. 35, 38–39, 95 S.Ct. 2091, 2094, 45 L.Ed.2d 1 (1975), a case in which the right to presence guaranteed by Fed.R.Cr.P. 43 was dispositive.

45 L.Ed.2d 562 (1975).[10] See *Badger v. Cardwell*, 587 F.2d 968, 970–71 (9th Cir. 1978); *United States v. Walls*, 577 F.2d 690, 698 (9th Cir.), *cert. denied*, 439 U.S. 893, 99 S.Ct. 251, 58 L.Ed.2d 239 (1978); *Polizzi v. United States*, 550 F.2d 1133, 1137–38 (9th Cir. 1976).

■ We need not reach the constitutional issue in this case, however, because defendants have an explicit, unqualified right under Rule 43 of the Federal Rules of Criminal Procedure to be present at the jury impaneling, as well as at all other stages of the trial. In adopting Rule 43, Congress explicitly intended to codify existing law concerning a defendant's constitutional and common law rights to be present throughout trial. Fed.R.Crim.P. 43, 1946 Advisory Committee Note, ¶ 1. Rule 43 embodies the right to be present derived from the Sixth Amendment Confrontation Clause, the Due Process Clause of the Fifth and Fourteenth Amendments, and the common law privilege of presence. 8B *Moore's Federal Practice* ¶ 43.02[1], at 43–67 (2d ed. 1980). Thus, the scope of Rule 43 was intended to be broader than the constitutional right. Accordingly, insofar as due process is concerned, the statutory right is at least as far–reaching as the constitutional right.[11] *Id.; United States v. Brown*, 571 F.2d 980, 986 (6th Cir. 1978); *United States v. Gregorio*, 497 F.2d 1253, 1257 (4th Cir.),

*cert. denied*, 419 U.S. 1024, 95 S.Ct. 501, 42 L.Ed.2d 298 (1974).

## B.

■ Rule 43(a) provides:

"The defendant shall be present at the arraignment, at the time of the plea, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by this rule."

A violation of Rule 43 in some circumstances may be harmless error. *Rogers v. United States*, 422 U.S. 35, 40, 95 S.Ct. 2091, 2095, 45 L.Ed.2d 1 (1975); *United States v. Alper*, 449 F.2d 1223, 1232–33 (3d Cir. 1971), *cert. denied*, 405 U.S. 988, 92 S.Ct. 1248, 31 L.Ed.2d 453 (1972), *rehearing denied*, 406 U.S. 911, 92 S.Ct. 1605, 31 L.Ed.2d 822 (1972). In *Alper*, the defendants were not present during supplemental instructions to the jury, although their counsel were there. No objection was raised at the time, but on appeal defendant–appellant argued that his right to be present could not be waived and was not harmless error. This court said at 1232 of 449 F.2d:

"Here, clearly, is an instance in which trial counsel must be assumed to have implied authority to receive notice of a conference respecting inquiries from the

10. *Faretta* reiterated the holding of *Snyder v. Massachusetts*, 291 U.S. 97, 107–08, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934):

"[T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only.

"We are thus brought to an inquiry as to the relation between the defendant's presence at a [portion of the proceeding] and the fundamental justice assured to him by the Constitution of the United States."

Neither *Faretta* nor *Snyder* concerned absence from a portion of the jury impaneling. Both cases rely on the Sixth and Fourteenth Amendments. In *Snyder v. Massachusetts*, 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934), the defendant was denied permission to attend a view of the scene of the crime. The judge, attorneys for both parties, and the court stenographer accompanied the jurors. The court held that the defendant's constitutional rights had not been violated because any assistance he could

have provided his attorney would have been minimal. *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), concerned the defendant's right to represent himself at a criminal trial. Thus, they do not provide clear guidance to us in determining the extent of due process protection that should be afforded in the circumstances of the instant case.

11. Both the statutory and the constitutional rights are subject to the harmless error doctrine. Fed.R.Crim.P. 52(a); *Chapman v. United States*, 386 U.S. 18, 21–22, 87 S.Ct. 825, 826, 17 L.Ed.2d 705 (1967). In this case the Court said at page 22, 87 S.Ct. at page 827:

"[T]he United States long ago through its Congress established for its courts the rule that judgments shall not be reversed for 'errors or defects which do not affect the substantial rights of the parties.' 28 U.S.C. § 2111."

(Footnote omitted.)

jury. The court was entitled to rely upon counsels' performance of their agency duties and to assume that appellants' absence was voluntary.

"Appellants point to *United States v. Neal,* 320 F.2d 533 (3rd Cir. 1963), as authority for the impropriety of instructing the jury in the absence of the defendant. The *Neal* case involved a supplemental instruction which in the circumstances was highly prejudicial and a dispute over whether even defendant's counsel was informed. Compare *United States v. Grosso,* 358 F.2d 154 (3rd Cir. 1965), reversed on other grounds, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968), applying the harmless error rule to an instruction, in the absence of both counsel and the defendant, to continue deliberations.... [T]he very language of the second sentence of Rule 43 recognizes that in some circumstances a trial may proceed in the absence of the defendant. The validity of the *Lewis* dictum must be questioned in view of the subsequent adoption of Rule 43 and of the decision in *Illinois v. Allen,* 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970)."

If there is no reasonable possibility of prejudice from the error, it is deemed harmless. *United States v. Giacalone,* 588 F.2d 1158, 1165 (6th Cir. 1978), *cert. denied,* 441 U.S. 944, 99 S.Ct. 2162, 60 L.Ed.2d 1045 (1979); *United States v. Brown,* 571 F.2d 980, 987 (6th Cir. 1978); *Blackwell v. Brewer,* 562 F.2d 596, 599 (8th Cir. 1977); *United States v. Rodriguez,* 545 F.2d 829, 831 (2d Cir. 1976), *cert. denied,* 434 U.S. 819, 98 S.Ct. 58, 54 L.Ed.2d 74 (1977); *Wade v. United States,* 441 F.2d 1046, 1050 (D.C.Cir.1971).

Defendants contend that absence from a portion of jury impaneling can never be harmless error. To support this proposition they rely on *United States v. Crutcher,* 405 F.2d 239, 244 (2d Cir. 1968), *cert. denied,* 394 U.S. 908, 89 S.Ct. 1018, 22 L.Ed.2d 219 (1969). In *Crutcher* five men were charged with hijacking a truck. Two pleaded guilty while two others were scheduled for trial. Payne, the fifth defendant, remained at large. On the day the trial commenced in Connecticut, the prosecutor's office was notified that Payne had been arrested in New Jersey. An attempt to have him brought to Connecticut that day failed. The trial judge, believing it was necessary to go forward, impaneled the jury. The attorney appointed to represent Payne agreed to proceed with the jury selection in his client's absence. Payne arrived in court after the jury had been selected, but before the rest of the trial had begun. Thus, in *Crutcher* the defendant was absent during all of the *voir dire* and jury selection. The Second Circuit found that this absence violated Rule 43.[12]

The facts in the instant case are clearly distinguishable from those in *Crutcher.* Alessandrello and Lacognata were not excluded from the entire *voir dire*; they were present for all but one small portion of it. They saw each of the prospective jurors and heard each of them respond to questions about personal and general matters. Alessandrello and Lacognata recognize this case does not present the same circumstances as *Crutcher.* They point, however, to the following language in *Crutcher*:

12. The holding in *United States v. Crutcher,* 405 F.2d 239 (2d Cir. 1968), *cert. denied,* 394 U.S. 908, 89 S.Ct. 1018, 22 L.Ed.2d 219 (1969), is based on Fed.R.Crim.P. 43. In addition to Rule 43, *Crutcher* refers to "an elementary principle of due process that a defendant must be allowed to be present at his own trial," id. at 242, but does not illuminate exactly to what extent due process guarantees the right of a defendant to be present during the impaneling of a jury. Furthermore, *Crutcher's* analysis relies on *Lewis v. United States,* 146 U.S. 370, 13 S.Ct. 136, 36 L.Ed. 1011 (1892), and *Hopt v. Utah,* 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262 (1884), two cases which concern the non–constitutionally based right of presence. See note 9, *supra.*

On appeal in *Crutcher,* the Government argued that Payne had waived his rights under Rule 43. Noting that there was no indication that the defendant had actually spoken to or retained his attorney at the time of the jury impaneling, the court remanded for a determination of whether the defendant had waived his right to be present; it directed that a new trial be granted if the trial judge found that there had been no effective waiver.

"It is true that as a general rule a violation of Rule 43 does not require reversal if the record affirmatively indicates beyond a reasonable doubt that the error did not affect the verdict .... However, the court in [*Chapman v. United States*, 386 U.S. 18, 23 [, 87 S.Ct. 824, 827, 17 L.Ed.2d 705] (1967)] ... noted that some of 'our prior cases have indicated that there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error.' A defendant's right to be present while the jury is selected would appear to be such a right."

*Id.* at 244. Alessandrello and Lacognata argue that *Crutcher* thus set forth a rule requiring automatic reversal if the defendant is absent from any part of the jury impaneling, and they urge this court to adopt such a rule. We conclude that it would be unwarranted to apply the *Crutcher* rule to the facts of this case. We note that other courts, including the Second Circuit in a later case, *United States v. Dioguardi*, 428 F.2d 1033, *cert. denied*, 400 U.S. 825, 91 S.Ct. 50, 27 L.Ed.2d 54 (1970), have affirmed convictions despite the defendant's absence from part of voir dire when the circumstances showed that the error was harmless. Accordingly, we have concluded that the harmless error test for reviewing violations of Rule 43's requirement that the defendant be present at his jury's impaneling is applicable to this record.

In *Dioguardi*, a case decided two years after *Crutcher*, the Second Circuit followed the harmless error principle. There the defendants were present in the courtroom during the impaneling of the jury. They were able to view the prospective jurors and to hear their responses to questions. The defendants were excluded from one portion of the inquiry, however. The judge questioned the prospective jurors individually at sidebar about the extent to which they had been exposed to pre-trial publicity. This examination took place out of the hearing of the defendants. Remarking that the defendants were only seated 15–20 feet away, that they were represented at sidebar by experienced counsel, and that ample time was given for counsel to consult with defendants, the appellate court concluded that this procedure did not constitute reversible error.[13]

The Fifth Circuit in *Henderson v. United States*, 419 F.2d 1277 (1970), also reviewed a case in which the defendant had been absent from a small portion of the jury selection. During his absence the defense counsel exercised his only challenge for cause, which was granted. The defendant was present for the rest of the challenge period. The court held that this violation of Rule 43 was harmless error.

In *Phillips v. United States*, 533 F.2d 369 (8th Cir.), *cert. denied*, 429 U.S. 924, 97 S.Ct. 324, 50 L.Ed.2d 292 (1976), the court was also faced with a claim that a defendant should have his conviction reversed on the basis that he was absent during the period in which challenges were made. While recognizing that a defendant is entitled to be present at all stages of his trial, including jury selection, the court noted that the record revealed that the defendant was present during most of the jury selection process and was only absent for approximately 10 minutes while the attorneys exercised their strikes. In light of these facts, the court declined to find reversible error.[14]

---

**13.** The defendants in *United States v. Dioguardi*, 428 F.2d 1033, 1039 (2d Cir.), *cert. denied*, 400 U.S. 825, 91 S.Ct. 50, 27 L.Ed.2d 54 (1970), did not request to be present at sidebar. The appellate court did not base its affirmance on waiver, however. Rather, it reviewed all the circumstances surrounding the *voir dire* to determine whether the procedure utilized constituted reversible error. In so doing, it necessarily rejected an automatic reversal rule.

**14.** *See United States v. Chrisco*, 493 F.2d 232 (8th Cir.), *cert. denied*, 419 U.S. 847, 95 S.Ct. 84, 42 L.Ed.2d 77 (1974), in which the defendants were present for the entire *voir dire*. After the challenges for cause were exercised, the court recessed for noon and the defendants were removed from the courtroom. The attorneys stayed in the courtroom and exercised the peremptory challenges. After the recess, the courtroom clerk read the list of jurors who had been selected. At this point the defendants apparently expressed to their counsel their disapproval of some of the jurors who had been seated. The defense counsel did not make a

*United States v. Brown*, 571 F.2d 980 (6th Cir. 1978), presented a slightly different problem under Rule 43. The trial judge held a conference in chambers to discuss the dismissal of a juror.[15] The defendants were not present, but their attorneys were. The appellate court ruled that the defendants had a right under Rule 43 to be present at an in–chambers conference concerning the dismissal of a juror. However, after examining the transcript of the conference and noting that defense counsel had been zealous advocates of their clients' interests, the court concluded that there was no reasonable possibility of prejudice in the case, and affirmed the convictions. See *United States v. Alper, supra* at 1232.

We are persuaded by our review of these cases that the portion of Rule 43 which recognizes the right of a defendant to be present during jury impaneling does not require a holding that reversible error was committed on the record in this case. The harmless error doctrine should apply to this provision just as it does to other provisions of Fed.R.Crim.P. 43. In *Alper, supra*, this court said at 1232–33 of 449 F.2d:

> "In the circumstances here presented the court was not in error in relying on the authority of defense counsel to act for their client.
>
> "Moreover, assuming such reliance to have been misplaced the error was harmless beyond a reasonable doubt. *Chap-*

*man v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Neither communication to the jury is claimed to be erroneous. That the instruction as to the verdict was understood by the jury is demonstrated by its verdict. It acquitted one defendant on all counts, convicted one defendant on all counts, and found one defendant guilty on one count and not guilty on twenty counts. The inquiry with respect to the exhibit list and the agreed upon reply can hardly be raised to the dignity of an instruction. The exhibits were in the jury room, and their numbering was a housekeeping detail. Appellant Greenberg urges that with his experience he might have suggested a manner of responding to the inquiry about the exhibits that would have been helpful to him but he does not say what or how. We could not reverse on a ground so entirely speculative." (Footnote omitted.)

### C.

■ Alessandrello and Lacognata advance a further argument. They contend that, even if a harmless error rule applies to violations of Rule 43, their convictions should be reversed on the alternative ground that their exclusion from part of the *voir dire* unduly impaired their right to exercise their peremptory challenges.[16]

---

formal objection known to the trial court. Reviewing this situation on appeal, the court stated that Rule 43 guaranteed the defendants a right to be present at all steps of selecting a jury, including the exercise of peremptory strikes. Nonetheless, it concluded that the fact that the defendants were present at the time the clerk gave effect to the strikes by reading the list of jurors, and had registered their opinions with their attorneys, demonstrated that the error was harmless.

**15.** This conference occurred during trial. The jury had been sequestered. The U. S. Marshal reported to the judge that one juror had had a serious argument with her husband on the telephone the night before. The judge decided to excuse the juror because the trial was scheduled to continue for at least another week and he did not consider it wise to have a person who was upset and anxious over her marriage serve as a juror for that length of time.

**16.** Our analysis of this claim begins with a recognition that a defendant's right to peremptory challenges is statutorily, not constitutionally, based. *See* Fed.R.Crim.P. 24(b). As the Supreme Court has said:

> "There is nothing in the Constitution of the United States which requires the Congress to grant peremptory challenges to defendants in criminal cases; trial by impartial jury is all that is secured."

*Stilson v. United States*, 250 U.S. 583, 586, 40 S.Ct. 28, 29, 63 L.Ed.2d 1154 (1919). In fact, since the right to peremptory challenges is "in the nature of a statutory privilege, ... [it] may be withheld altogether without impairing the constitutional guaranties of 'an impartial jury' and a fair trial." *Frazier v. United States*, 335 U.S. 497, 505 n. 11, 69 S.Ct. 201, 206 n. 11, 93 L.Ed. 187 (1948). Nonetheless, "the persistence of peremptories and their extensive use demonstrate the long and widely held belief that peremptory challenge is a necessary part

They assert that they might have observed something about a prospective juror during the examination concerning exposure to pre–trial publicity which might have led them to make suggestions to their attorneys regarding peremptory strikes. They contend that their absence must give rise to a presumption of prejudice because the ephemeral nature of the information they might have gathered makes it impossible to assess the extent of actual prejudice they suffered.

Alessandrello and Lacognata do not in any way attack the impartiality of the jury. Their sole complaint is that they were deprived of some unspecifiable information which might have been helpful in the exercise of their peremptory challenges.[17] In their view, this limitation in itself necessarily denied them a fair trial. We do not agree. While we do not approve of the *voir dire* procedure followed in this case, we do not believe it deprived the defendants of a fair trial.

In view of the record, showing that defense counsel agreed on the jury as selected as pointed out above, the statement of the dissent that the peremptory challenges were impermissibly controlled by the court is not supported by the record.

■ Although the presence of attorneys in the anteroom was not a waiver of the defendants' right to be present, their agreement to the jury as selected, after consultation with their clients, was a waiver as to all matters other than the absence of the defendants from the questioning in the anteroom. As pointed out above at note 17, the dissent has not been able to point to any unfairness manifested by any juror who served during any moment of the trial, even though all the statements made in the anteroom portion of the *voir dire* have been transcribed. See Document 38 in Crim. No. 79–269, D.N.J.

We are aware that other courts presented with claims that the defendants were deprived of some information which might have been helpful in the exercise of their peremptory challenges have reviewed the circumstances of the particular cases to determine if the convictions should be reversed. In all of the cases concerning jury impaneling cited above in section B, the defendants were absent during part of the jury selection, and thus were necessarily deprived of some information about prospective jurors which might have affected their suggestions regarding peremptory challenges. Yet, in each instance, the error was deemed harmless. In different contexts, limitations on information potentially useful for peremptory challenges have also been upheld. For example, in *United States v. Barnes*, 604 F.2d 121 (2d Cir. 1979), *cert. denied*, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980), the district court refused to disclose the names, addresses, neighborhoods, religions, or ethnic backgrounds of the prospective jurors. The

---

of trial by jury," *Swain v. Alabama*, 380 U.S. 202, 219, 85 S.Ct. 824, 835, 13 L.Ed.2d 759 (1965), and the challenge has been described as "one of the most important of the rights secured to the accused." *Pointer v. United States*, 151 U.S. 396, 408, 14 S.Ct. 410, 414, 38 L.Ed. 208 (1894).

**17.** Most of the dissent is based on possibilities of prejudice to a defendant not presented by the *voir dire* proceedings in this case. At page 151 of the dissent, *Snyder v. Massachusetts*, 291 U.S. 97, 106, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934), is relied on for the proposition that "[i]t is of the utmost importance that the defendant be present when the jury is being selected" because "he may identify prospective jurors that he knows." The two convicted defendant–appellants had ample opportunity to identify any jurors they knew during the 80–85% of the *voir dire* conducted in their presence.

At page 151 of the dissent, under "Second," the dissent again relies on *Snyder* as requiring the presence of the defendant so that he may make " 'suggestion[s] or even to supersede his lawyers altogether and conduct the trial himself.' " He had full opportunity in this case to take the quoted actions.

Under "Third" on page 151 the dissent quotes Blackstone on the desirability of a defendant not being tried by " 'any one man against whom he has conceived a prejudice even without ... reason." Since there may have been peremptory challenges available at the time the jury selection process ended in agreement on the composition of the jury, this possibility has not been demonstrated on this record.

defendants, 14 blacks and one Hispanic, accused of distribution of massive quantities of narcotics, were allowed to inquire into each prospective juror's family history, occupation, educational background, and membership in organized groups or clubs.[18] Despite the fact that peremptory challenges are often exercised on the basis of the "race, religion, [or] nationality" of a prospective juror, *Swain v. Alabama, supra* at note 16, 380 U.S. at 220, 85 S.Ct. at 836, the Second Circuit disagreed with the defendants' contention that the limitation on the information concerning religious and ethnic background impaired their exercise of peremptory challenges and deprived the defendants of a fair trial.[19] Thus, the case law does not support the *per se* rule advanced by Alessandrello and Lacognata.

Furthermore, policy considerations also convince us that the defendants' peremptory challenge theory reaches too far. Their position is that the defendant's absence from any portion of the *voir dire* vitiates the whole proceeding because no one can ever know what "sudden impressions and unaccountable prejudices"[20] he might have formed had he been present. In light of this view, the fact that an experienced trial attorney is present would be irrelevant because defendant and his counsel might form different impressions of the same individual. Under this theory, no matter how short

the absence from the impaneling nor what the cause,[21] nor how skilled the defendant's counsel, a new trial would be required. Although a *per se* rule would be easy of application, we do not believe it would further our interests in ensuring that defendants receive fair trials. By automatically requiring a new trial every time there was a miniscule infraction of the rule requiring presence at jury impaneling, even when the defendant presented only the most speculative claim of potential prejudice, we would be sacrificing considerable judicial resources without a corresponding increase in the actual fairness of trials. *See Snyder v. Massachusetts*, 291 U.S. 97, 122, 54 S.Ct. 330, 338, 78 L.Ed. 674 (1934) ("There is danger that the criminal law will be brought into contempt . . . if gossamer possibilities of prejudice to a defendant are to nullify a sentence pronounced by a court of competent jurisdiction in obedience to local law, and set the guilty free.").[22] Moreover, it is possible that such a rule might create an incentive for defendants to attempt to absent themselves from the jury impaneling for a short period.

Our reluctance to apply a *per se* rule in this matter leads us to take a case by case approach. As with other violations of Rule 43, in each instance that the defendant is absent from a portion of *voir dire*,[23] we

**18.** Additionally, the prospective jurors were asked if they had any close friends or relatives working for any agency dealing with narcotics control, any law enforcement group, or any other governmental agency. They were also questioned about their attitudes toward blacks and other racial groups.

**19.** *Cf. United States v. Vargas*, 606 F.2d 341, 346 (1st Cir. 1979) (defendant alleged his right to peremptory challenge was violated by juror's failure to reveal he had been in a mental hospital; court held that knowledge of juror's mental history would have subjected him to further interrogation during *voir dire*, but determined that a new trial was not necessary because there was no showing that the juror was biased or prejudiced against the defendant in any way).

**20.** 4 *Blackstone's Commentaries* 353 (Lewis's Edition).

**21.** Presumably, an explicit waiver by the defendant of his right to be present would be the one exception to this rule.

**22.** Also, the Court stated in *Snyder, supra*, relied on by the dissent:

"[T]he presence of the defendant [is required where it bears] a relation, reasonably substantial, to his opportunity to defend. Nowhere in the decisions of this court is there a dictum, and still less a ruling, that the Fourteenth Amendment assures the privilege of presence when presence would be useless, or the benefit but a shadow. What has been said, if not decided, is distinctly to the contrary."

291 U.S. at 106–07, 54 S.Ct. at 332.

**23.** We agree with the Second Circuit's holding in *United States v. Crutcher*, 405 F.2d 239 (2d Cir. 1968), *cert. denied*, 394 U.S. 908, 89 S.Ct. 1018, 22 L.Ed.2d 219 (1969), that without an effective waiver a defendant's absence from the

must examine the totality of the circumstances to determine whether the error is harmless. *See Rogers v. United States*, 422 U.S. 35, 40, 95 S.Ct. 2091, 2095, 45 L.Ed.2d 1 (1975).

### D.

The principles discussed above guide us in our analysis of the instant case. Alessandrello and Lacognata were, without a doubt, excluded from a portion of the *voir dire*. They did not waive their right to be present. This exclusion was a clear violation of Rule 43(a), pursuant to a method of impaneling the jury which we cannot countenance. Nonetheless, our review of the particular facts of this case convinces us that there is no reasonable possibility of prejudice to Alessandrello or Lacognata stemming from this error. The defendants urge that they were prejudiced in the exercise of their peremptories. However, as we have mentioned before, Alessandrello and Lacognata saw every prospective juror and heard each one respond to questions about personal background as well as general trial–related matters. They had a full opportunity to measure the demeanor of prospective jurors. Thus, they were able to gather the information upon which peremptory challenges have traditionally been based. Unfortunately, they were not allowed to be present at the questioning in the anteroom. However, since this portion of the examination concerned only one topic, since experienced defense counsel were present and were encouraged to consult with the defendants as frequently and as fully as they desired, and since the defendants were located in the courtroom only 25 feet away, any potential harm which could arise from this procedure was greatly diminished. When these facts are added to the fact that the trial judge in no way limited the amount of consultation which the defendants and their counsel were permitted to have with each other before selecting the

entire jury selection process cannot be determined to constitute harmless error.

**24.** We caution the trial judges in this circuit to comply fully with Fed.R.Crim.P. 43's direction

actual members of the jury, we conclude that in this instance the violation of Rule 43 constituted harmless error.[24]

### III.

■ Alessandrello and Lacognata also urge this court to reverse their conviction on the second count of the indictment. In this count they were charged with bank robbery in violation of 18 U.S.C. § 2113(a). The first part of subsection (a) of the statute provides:

"Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association ... [s]hall be fined not more than $5,000 or imprisoned not more than twenty years, or both."

Under this portion of the statute, a taking from the person or presence of another is an essential element of the crime. *United States v. McGhee*, 488 F.2d 781, 784 (5th Cir.), *cert. denied*, 417 U.S. 971, 94 S.Ct. 3176, 41 L.Ed.2d 1142 (1974) (indictment under first part of subsection (a) dismissed as fatally defective because it charged defendants with taking money from a bank and did not allege a taking from the person or presence of another); *cf. United States v. Brown*, 547 F.2d 36, 39 (3d Cir. 1976), *cert. denied sub nom. Redding v. United States*, 431 U.S. 905, 97 S.Ct. 1698, 52 L.Ed.2d 389 (1977) (offense described in the first paragraph of § 2113(a) is analogous to common law robbery).

■ The indictment charged Alessandrello and Lacognata with violating the statute by taking money in the control of Franklin Bank from the person or presence of William Dedrick. With regard to this aspect of the case, there is no dispute about the facts.

that "[t]he defendant shall be present ... at every stage of the trial including the impaneling of the jury ...."

The evidence was that Dedrick, pursuant to telephoned instructions, left the money in a wooded spot in Fort Lee, New Jersey. He then took a taxi home. Approximately one and one–half hours later, the defendants picked up the money.[25] Thus, the question presented is a legal one: does the retrieval of money delivered to a designated isolated wooded area by an individual who leaves the scene before the retrieval, the facts in this record, constitute a taking from the person or presence of that individual? The Ninth Circuit has answered this question in the negative. In *United States v. Culbert*, 548 F.2d 1355, 1356 (1977), *rev'd on other grounds*, 435 U.S. 371, 98 S.Ct. 1112, 55 L.Ed.2d 349 (1978), the court vacated a conviction under § 2113(a) because the criminal plan that the bank president should deliver money to a specified site and then return to the bank "did not contemplate a trespassory taking 'from the person or presence of' the bank president or any other person." The court held that without "proof of that essential element of the offense charged . . . , the judgment of conviction . . . must necessarily be vacated." *Id.* When the case was later remanded by the Supreme Court, the Ninth Circuit reiterated its reversal of the § 2113(a) conviction, explicitly stating it was following the reasoning set forth in its earlier opinion. *United States v. Culbert*, 581 F.2d 799, 799 (1978).

On the other hand, the majority of the United States Courts of Appeals have answered this question in the affirmative and have found violations of 18 U.S.C. § 2113(a) under substantially similar circumstances to those presented by this record. See *United States v. Hackett*, 623 F.2d 343 (4th Cir. 1980); *Brinkley v. United States*, 560 F.2d 871 (8th Cir. 1977); *United States v. Beck*, 511 F.2d 997, 1000 & 1003 (6th Cir. 1975). *Cf. United States v. Marx*, 485 F.2d 1179 (10th Cir. 1973); *contra, United States v.*

*Culbert*, 548 F.2d 1355 (9th Cir. 1977), 581 F.2d 799 (9th Cir. 1978).[26]

In *Brinkley, supra*, the branch manager of a bank received a call from one of several defendants, later convicted of violation of 18 U.S.C. § 2113(a), demanding that he get several thousand dollars or a bomb would go off at his home. He put $3,000, in a sack and, after receiving instructions at two different phone booths, "was ultimately directed to throw the money over the Arch Street viaduct." 560 F.2d at 872. He complied and drove away. None of the defendants ever secured possession of the money. Brinkley brought an action under 28 U.S.C. § 2255, contending "that since no one personally confronted [him], there was no taking or attempted taking 'from the person or presence of another' as required by § 2113(a)." 560 F.2d at 873. The court used this language in affirming the denial of the petition under 28 U.S.C. § 2255:

"[W]e find that the telephone call to [the branch manager] was as much of a personal confrontation as if Brinkley had entered the bank with a gun and demanded [the branch manager] hand over the bank's money. Through intimidation and fear [the branch manager] was forced to comply with the demands made upon him or else assume great personal risk. We also find that there was a taking from the person of [the branch manager] at the time he dropped the money over the viaduct at the exact spot the robbers had instructed. [The branch manager] lost possession and control of the money at that point, and the money was constructively in the possession of Brinkley and the coconspirators since they had the opportunity to pick it up, and intended to do so."

We conclude that this reasoning applies to the facts in the record in this case.

---

**25.** Trial transcript, September 29, 1979, at 533–37.

**26.** We do not disregard the words in 18 U.S.C. § 2113(a) requiring a taking or attempting to take "from the person or presence of another" of property "in the care, custody, control, management or possession of, any bank." On this

record, the money in the suitcase and bag (see pp. 133 and 134 above) was taken from Dedrick as a person and was in the care, custody, or management of the bank when deposited in the wooded area in Fort Lee known only to bank executive vice–president Dedrick and the defendants.

## IV.

Alessandrello and Lacognata also claim that there was insufficient evidence of their intent to steal from a bank. Asserting that the evidence at most showed an intent to extort money from Dedrick personally, they urge us to overturn the jury verdict on the third count. In examining this contention, we are bound to view the evidence in the light most favorable to the Government. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

The evidence showed that during the first call received by Dedrick, he was instructed to get $150,000., leave the bank, go across the street to a pay phone, and wait for a call which would give further instructions. Dedrick received a call on this pay phone 15 minutes after the initial contact. Because the defendants knew the number of the pay phone across the street from the bank, it is clear that they knew where Dedrick worked and that he was a banker. The very large amount of the demand further demonstrates that the money was not intended to come from Dedrick's individual account but from the bank itself. The evidence also showed that Dedrick was specifically instructed to bring only unmarked small bills with him. Furthermore, during the first conversation Dedrick told his caller that he did not know whether there was $150,000. in the bank vault. Additionally, the defendants not only called Dedrick at the bank originally, but continued to call the bank throughout the next day. It was while Dedrick was still at the bank that the defendants called him and increased their demand to $300,000. In light of these facts, we believe that there was certainly adequate evidence from which a jury could have concluded that the extortion was directed against the bank.

In a factual situation quite similar to the one before us, the Fifth Circuit decided that there was sufficient evidence of intent to rob a bank. *United States v. Carpenter*, 611 F.2d 113 (1980). There the son of the president and vice-president of a bank was abducted. The abductor telephoned the bank and forced the son to tell his parents to deliver $38,000. if they wished his safe return. Further telephone calls directed his mother, the vice-president of the bank, to take a series of steps which culminated in leaving the money in a designated place. Emphasizing that both parents were bank officers, that the abductor knew the parents worked at the bank, and that the abductor demanded a very large amount of money, the court held that the facts established that the extortion was directed at the bank and not solely at the parents. *Id.* at 114. *See generally United States v. Johnson*, 516 F.2d 209, 214–15 (8th Cir.), *cert. denied*, 423 U.S. 859, 96 S.Ct. 112, 46 L.Ed.2d 85 (1975).

Accordingly, we conclude that there was substantial evidence to support the finding of intent to steal from a bank. We sustain the guilty verdict returned by the jury on Count Three.

## V.

The defendants also argue that the trial court erred in admitting certain items into evidence. They contend that the judge incorrectly decided under Rule 403 of the Federal Rules of Evidence that the probative value outweighed the prejudicial effect of the following articles: a loaded .38 caliber revolver, a shoulder holster, coveralls, adhesive tape, ski masks, a navy watch cap, and sunglasses. We are bound by the trial court's rulings under Fed.R.Evid. 403 unless the court exercised its discretion arbitrarily or irrationally. *United States v. Agee*, 597 F.2d 350, 357 (3d Cir.), *cert. denied*, 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979); *United States v. Long*, 574 F.2d 761, 767 (3d Cir.), *cert. denied*, 439 U.S. 985, 99 S.Ct. 577, 58 L.Ed.2d 657 (1978). Our examination of the record reveals no such abuse of discretion. Consequently, we reject this contention.

Lastly, Alessandrello and Lacognata complain that the trial court incorrectly denied their request for an indefinite continuance. They ground this claim on the fact that the guilty plea entered by one of the co-defendants shortly before trial engendered a number of newspaper articles.

The grant or denial of a continuance is a decision entrusted to the discretion of the trial judge. *United States v. Walden*, 590 F.2d 85, 86 (3d Cir.), *cert. denied*, 444 U.S. 849, 100 S.Ct. 99, 62 L.Ed.2d 64 (1979); *United States v. Addonizio*, 451 F.2d 49, 61 (3d Cir. 1971), *cert. denied*, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972). Although some publicity was generated by the guilty plea, this was not a case in which there was pervasive publicity throughout the local area. *Cf. Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) (20 minute film of defendant's confession at police interrogation was broadcast three times by television station in community of 150,000 where crime and trial took place); *United States v. Haldeman*, 559 F.2d 31, 141 (D.C. Cir. 1976), *cert. denied sub nom. Ehrlichman v. United States*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977) (newspaper coverage in local area averaged between 30 and 120 column inches per day for two years; presumption of juror bias unwarranted). Moreover, the trial judge in the instant case did examine each prospective juror individually concerning pre–trial publicity, and the defense attorneys, after hearing the responses on that issue, challenged none of them for cause. These factors, considered together, convince us that the denial of the motion for an indefinite continuance was not an abuse of discretion.

## VI.

In conclusion, we hold that the procedure used by the trial court in conducting a portion of the jury selection proceedings out of the presence of the defendants violated Fed.R.Crim.P. 43(a), and should not be repeated. In light of the considerations discussed and the totality of the circumstances of this case, however, we believe that in this instance the error committed was harmless and does not require reversal. Turning to the individual offenses charged, we conclude that the defendants' convictions of violating § 2113(b) and (e) will be affirmed. Also, there was sufficient evidence of intent to steal from a bank and, therefore, the convictions under § 2113(b) and (e) will be affirmed. Finally, we hold that the trial court did not err in admitting certain items into evidence or in denying the defendants' request for an indefinite continuance.

Accordingly, we affirm the judgments in all respects.

A. LEON HIGGINBOTHAM, Jr., Circuit Judge, dissenting.

I join in Parts III, IV and V of the majority opinion. Because I believe that the errors in the conduct of the *voir dire* require reversal, I respectfully dissent from the judgment of this court. In my view, the willful judicial exclusion of Alessandrello and Lacognata from a critical portion of their *voir dire* is an error which cannot be dismissed as harmless beyond a reasonable doubt. The standard the majority uses to reach its decision will make it almost impossible for future defendants to challenge a denial of both their right to be present during their trial and their right to exercise peremptory challenges. I am especially concerned because the majority's approach seriously erodes the defendants' right to make decisions which are important to their defense.

I am not unmindful of the overwhelming evidence against the defendants, and I recognize that the distinguished trial judge, in all but one respect, presided admirably over a difficult trial involving a highly publicized and tragic crime. If judges rulings were rated, like baseball players, for their general batting average, certainly the trial judge had an almost perfect record when one recognizes the challenges of this case. But the trial of a case is not like the arena of sports. The losses of the defendants, where here they received sentences of 21 years, cannot be recouped or redeemed in next year's World Series.

## I.

### A.

The significance of the majority's holding cannot be gleaned from a mere reading of the cold trial record or by a bland recitation of the questions which were asked during the time the defendants were excluded

from one of the vital portions of their own trial. A critical part of the jury selection process is the use of the peremptory challenge. The challenge for cause permits the defendant to exclude individuals about whom he has articulable objections; the peremptory, on the other hand, permits him to exclude persons based on inarticulable feelings. The peremptory protects that which we know as women and men, namely, that inarticulable hunches and intuitions are often accurate perceptions of reality. The Supreme Court reflected on this in *Hayes v. Missouri*, 120 U.S. 68, 70, 7 S.Ct. 350, 351, 30 L.Ed. 578 (1887), where it stated:

> Experience has shown that one of the most effective means to free the jury–box from [jurors] unfit to be there is the exercise of the peremptory challenge. The public prosecutor [and, presumably the defendant] may have the strongest reasons to distrust the character of a juror offered, from his habits and associations, and yet find it difficult to formulate and sustain a legal objection to him. In such cases, the peremptory challenge is a protection against his being accepted.

The decision making in the peremptory challenge process occurs within a milieu that makes is virtually impossible or at least "difficult to formulate", *Hayes v. Missouri, supra,* the reasons why the peremptory objections were or were not exercised. Yet it is within this elusive area that the facts of record must be understood.

Judge Meanor, after addressing the jury pool, elected to question each prospective juror individually in a small anteroom located off the main courtroom. Since the room was too small to accommodate the judge and his law clerk, counsel, a court reporter, a court clerk, the prospective juror and defendants, defendants were excluded from this portion of their own *voir dire* proceeding.

The trial judge explained that the reasons for exclusion of defendants from the anteroom proceedings were those of convenience ("technical and logistical problems") and a desire to avoid the prejudice which might occur "in open court [when] . . . a prospective juror will say something which would provide an argument that an entire group has been contaminated by what that juror has said." He recognized that such contamination was a "significant risk in a case of this caliber." [1]

I find this exclusion in itself startling when we recognize the importance of the

1. THE COURT: All right.
Well, look, I think for the benefit of the record I ought to point out that I have behind this courtroom two small rooms. I would say probably 80 percent of the jury interrogation or my addresses to the jury took place in the presence of the defendants. I have a small room that I use to interrogate the jurors on two topics; one was the extent of publicity that they had read or seen or heard in regard to this case and there can be no gainsay in the fact that this case has received extensive publicity. The second topic of inquiry was whether the jurors had as a result of that publicity or otherwise, any preconceived notions about the guilt of the defendants. I have technical and logistical problems. Well I might agree that it would be preferable that the defense be present throughout the entire jury interrogation, not just 80 or 85 percent of it, I run a significant danger if I do this interrogation in open court, with the members of the Panel present or the groups of 16 present, that someone in open court who is a prospective juror will say something which would provide an argument that the entire group has been contaminated by what that juror has said.

Now, that is a significant risk in a case of this caliber and it was primarily that risk that I chose to avoid by interrogating the jurors upon these rather extensive topics, individually.

The defendants certainly were present at that interrogation at what I call sidebar or in the anteroom, through their counsel. I don't think any counsel will deny that counsel were told that any time during the interrogation or at the end thereof if they wished to leave and consult with their clients, who were in the courtroom only for 20, 25, 30 feet away, they were free to do so. I've got to have a little play in the joints of this judicial machinery to make it work and I believe that doing it in this fashion was within my discretion. I do not believe it was an abuse of that discretion.

I think you're adequately preserved on this point on the record for Appellate review.

MR. HOROWITZ: I just would like to make another comment, your Honor, so the record is complete, I, of course, agree with your Honor's motives and intention in the

*voir dire* proceedings and where defendants' objections had been made explicitly to the trial judge. The objection was not an afterthought as in *United States v. Dioguardi*, 428 F.2d 1033, 1039, n.4 (2d Cir.) *cert. denied*, 400 U.S. 825, 91 S.Ct. 50, 27 L.Ed.2d 54 (1970), where the objection to the *voir dire* proceedings was raised for the first time at the hearing on sentencing. Here, counsel for defendants stated the objection explicitly.[2]

The solution to this logistical problem was easy though perhaps more time consuming. The trial judge could have had individual jurors brought into the main courtroom one at a time where they could have been questioned in the presence of the defendants, and it appears that there was a room close by where the proceedings could have taken place but as the trial judge noted "it would have taken a lot of extra time to shuffle everybody over there and back."

**B.**

The majority concedes that the exclusion of the defendants "was a clear violation of Rule 43(a)" which guarantees to each defendant the right to "be present ... at every stage of the trial including the empaneling of the jury ..." Fed.R.Crim.P. 43, and it cautions the trial judges in this circuit to fully comply with the rule in the future. However the majority decided that this exclusion was harmless error because

> this portion of the examination concerned only one topic, since experienced defense counsel were present and were encouraged to consult with the defendants as frequently and as fully as they desired, and since the defendants were located in the courtroom only 25 feet away, any potential harm which could arise from this procedure was greatly diminished. When these facts are added to the fact that the trial judge in no way limited the amount of consultation which the defendants and their counsel were permitted to have with each other before selecting the actual members of the jury, we conclude that in this instance the violation of Rule 43 constituted harmless error. (footnote omitted)

> THE COURT: It's more than that and it would have taken a lot of extra time to shuffle everybody over there and back.
> Any further motions you wish to make?
> MR. HOROWITZ: That's it.
> Appendix at 75–79.

> 2. MR. HOROWITZ: We objected to the procedure whereby individuals members of the jury panel were interviewed by Your Honor in the anteroom outside the courtroom, outside of the presence of the defendants. The reason for that is that the defendants are entitled to exercise peremptory challenges. *A peremptory challenge can be based on anything, it can be based on a gut feeling, an innate distrust, whatever.* Your Honor knows. For my client not to have had the opportunity to see each and every one of those jurors as they answered the questions at close range, if you will, more pointed questions than were–and alone, as distinguished from being a member of a panel and sitting in the box in a large room, it deprived them of the opportunity to see that, to get that feeling and to communicate that to counsel, which of those jurors he would prefer having or not having. (emphasis added)
> Appendix at 75.

> procedure except I suggested it to your Honor yesterday and I repeat again here for the record that your Honor had a very feasible alternative; that individual interrogation could have been conducted in a larger room where the defendants could have been present. Indeed it could have been done in the courtroom with only one potential witness in the courtroom.
> THE COURT: Yes, it could have been and it could have been bringing one juror in at a time instead of in groups of 16 and it would have been all week picking a jury. I don't have logistically the place with which I can retire with four attorneys, four defendants, a Court Clerk, a Court Reporter, two attorneys for the Government and, perhaps, one of my law clerks to take care of this matter.
> All right. You made your point. Denied.
> MR. HOROWITZ: Your Honor, there was a room which was quite adequate for that purpose and it was the room in which the defendants were held and which all four counsel were given the opportunity to consult with their defendants after we conducted the interrogation right across the hall.
> THE COURT: It's a jury room what you're talking about.
> MR. HOROWITZ: It's no more than 10 or 20 feet.

Majority Opinion at page 144.

It seems particularly ironic that the majority concludes that the questioning of a prospective juror (in the absence of the defendants) was harmless error when the jurors were being questioned on the "one topic" so sensitive that the trial judge feared, in his own words, that if another juror heard the answer it "would provide an argument that the entire group has been contaminated by what that juror has said." Appendix at 76. If the topic is potentially poisonous enough to contaminate a whole group of jurors, why isn't it important enough for the defendants to be present to make their own judgments on the prospective juror's responses and to decide by what they hear and see whether they want to exercise a peremptory challenge against that juror?

While I commend wholeheartedly the trial judge's concern for preventing the possible prejudice of pretrial publicity, a reading of the transcript, pertaining to the anteroom questioning, reveals that questions were asked and issues raised which are precisely the type of interchanges the defendants are entitled to witness in order to make meaningful their use of the peremptory challenge. For example, one prospective female juror acknowledged having read about the crime in the newspaper and also having been the victim of a past burglary. The defendants' counsel challenged her for cause because "I think she is going to have some inner feelings that–she ... [like the victim of the instant kidnapping is] a woman who is home alone." T.R. at 84. Judge Meanor denied the challenge for cause. While counsel could have cast one of the defendants' peremptory challenges on their behalf, the defendants by their absence were deprived of an opportunity to observe the would–be juror's demeanor.

Similarly the following interchange, in the absence of the defendant, between the court and a prospective juror is illustrative of the need for the defendants' presence:

EXAMINATION OF PROSPECTIVE
JUROR NO. 4

BY THE COURT:

Q. Mr. Williams, do you recall having read anything about this case in the papers or heard about it over the news media?

A. Yes.

Q. Tell me what you specifically remember?

A. Well, it was a while ago, I didn't pay that much attention. I don't particularly like sensational cases per se. The only impression that I remember is that there seems to be some inherent stupidity on the part of the defendant.

Q. Mr. Williams, these people are entitled to a fair trial. Do you believe that there is any reason why you can't give them a fair trial?

A. No, not on that basis.

Q. Do you think you would hesitate at all to bring back a verdict of not guilty if you found the case had not been proved beyond a reasonable doubt?

A. No problem.

Q. I might jar your memory. Do you recall having read anything in the newspapers or heard over the news media anything about the alleged abduction of one Joan Dedrick whose husband was a vice president of a bank?

A. Yes.

Q. Has this led you to form any opinion as to the guilt or innocence of the people now on trial?

A. I didn't follow it that closely, sir.

Q. I take it your answer is in the negative?

A. Yes.

T.R. at 59, 60. Counsel's challenge for cause was again denied.

Reading from the cold record we cannot always appreciate the nuances of a trial. Should we believe that simply because prospective juror Williams said he believed that the defendants were entitled to a "fair

trial" that Williams really meant it? What does the record really reveal from Williams' answer "I don't particularly like sensational cases per se. The only impression that I remember is that there seems to be some inherent stupidity on the part of the defendant."?

As I read many of the answers throughout the anteroom *voir dire* proceedings there were persistent issues of credibility as to the prospective jurors. How can it be harmless error when the defendants are excluded from hearing and seeing the jurors being questioned on matters which the trial judge considered sensitive and possibly prejudicial?

## II.

The jury selection process in federal courts is too precious a right to sanction the trial judge's well intentioned, but purposeful, exclusion of the defendants from approximately twenty per cent of their own *voir dire* proceeding. The majority views the lower court's exclusion of the defendants from a portion of their own *voir dire* proceeding as mere "harmless error" and stresses that "Alessandrello and Lacognata do not in any way attack the impartiality of the jury." Majority Opinion at page 142.

Perhaps my fundamental disagreement with the majority is our differing perception of the purposes for the *voir dire* proceeding. By relying on the fact that ultimately an impartial jury was selected in this case, the majority neglects the critical importance of the defendants' right to participate in every stage of their trial. Clearly the majority would not condone a jury selection process, whereby the defendants were given absolutely no say, merely because it resulted in an impartial jury panel.

It is of the utmost importance that the defendant be present when the jury is being selected. First, his presence will make for a more effective defense, because it enables the defendant "to give advice or suggestion" to his lawyer during the trial. *Snyder v. Massachusetts*, 291 U.S. 97, 106, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934). This is important because the defendant has unique knowledge which is important at all stages of the trial, including *voir dire*. At the *voir dire* he may, for example, identify prospective jurors that he knows. He may also have knowledge of facts about himself or the alleged crime which may not have seemed relevant to him in the tranquility of his lawyer's office, and thus may not have been disclosed, but which may become important as the individual prejudices or inclinations of the jurors are revealed. He may also be a member of the community in which he will be tried and might be sensitive to particular local prejudices his lawyer does not know about.

Second, if present, the defendant will be able to make decisions about his defense, as well as advise his lawyer. Unless he is present, he cannot observe how his defense is unfolding and would be unable to make "suggestion[s] or even to supersede his lawyers altogether and conduct the trial himself." *Snyder v. Massachusetts*, 291 U.S. at 106, 54 S.Ct. at 332. He must be present so that he may participate in the defense, if he wishes, "for it is he who suffers the consequences if the defense fails." *Faretta v. California*, 422 U.S. 806, 819–20, 95 S.Ct. 2525, 2533, 45 L.Ed.2d 562 (1975). *See United States v. Williams*, 631 F.2d 198 (3d Cir. 1980) (Adams, J., dissenting) (discussing in detail the defendant's right to control his own defense).

Third, the defendant's presence at the *voir dire* not only affects the actual attainment of an impartial trial, but also is important to the appearance of impartiality. As Blackstone pointed out, "how necessary it is that a prisoner (when put to defend his life) should have a good opinion of his jury the want of which might totally disconcert him; the law wills not that he should be tried by any one man against whom he has conceived a prejudice even without being able to assign a reason for such his dislike." 4 Blackstone 353, *quoted in, Lewis v. United States*, 146 U.S. 370, 376, 13 S.Ct. 136, 138, 36 L.Ed. 1011 (1892).

Although the Supreme Court has never held that the peremptory challenge is required by the Constitution, it has remarked

frequently on its significance. *See e. g., Lewis v. United States*, 146 U.S. at 378, 13 S.Ct. at 139 ("essential in contemplation of law to the impartiality of the trial"); *Pointer v. United States*, 151 U.S. 396, 408, 14 S.Ct. 410, 414, 38 L.Ed. 208 (1894) ("one of the most important of the rights secured to the accused"); *Swain v. Alabama*, 380 U.S. 202, 219, 85 S.Ct. 824, 835, 13 L.Ed.2d 759 (1965) ("a necessary part of trial by jury."). The peremptory challenge is important because it helps the defendant select a jury by giving him "an opportunity beyond the minimum requirements of fair selection to express an arbitrary preference among jurors properly selected and fully qualified to sit in judgment on his case." *Frazier v. United States*, 335 U.S. 497, 506, 69 S.Ct. 201, 206, 93 L.Ed. 187 (1948).

The peremptory challenge procedure was not designed to implement a judge's perception of what constitutes an impartial jury. The peremptory challenge was designed for the defendant and the prosecutor—neither the trial judge nor the appellate courts are given the right to cast the litigants' ballot for peremptory challenges. Plainly speaking, it is not for judges to select the type of jury which will decide the fate of the accused. More than a decade ago Justice White, speaking for the Court in *Swain*, stressed that:

> The essential nature of the peremptory challenge is that it is one exercised without a reason stated, without inquiry and without being subject to the court's control.

380 U.S. at 220, 85 S.Ct. at 835. In this case, the peremptory challenge was impermissibly "subject to the court's control" and therefore constituted reversible error.

This is a case where appreciation of the applicable legal precepts casts the facts in their proper perspective. Appellate courts should be extremely cautious when they decide beyond a "reasonable doubt" that a defendant would not have found an inarticulable suspicion important enough to exclude an individual from the jury. That decision cannot be made here because the portion of the *voir dire* from which the defendants were excluded, involved important issues about possible prejudice of the jurors. The majority asserts with confidence that the exclusion was mere harmless error. Its holding defies the principles of law which Mr. Justice Shiras reaffirmed almost a century ago when adopting the earlier views of both Justice Story and Blackstone:

> (1) As every one must be sensible, what sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another; and how necessary it is that a prisoner (when put to defend his life) should have a good opinion of his jury, the want of which might totally disconcert him, the law wills not that he should be tried by any one man against whom he has conceived a prejudice even without being able to assign a reason for such his dislike. (2) Because, upon challenges for cause shown, if the reason assigned prove insufficient to set aside the juror, perhaps the bare questioning his indifference may sometimes provoke a resentment; to prevent all ill consequences from which, the prisoner is still at liberty, if he pleases, peremptorily to set him aside.

*Lewis v. United States*, 146 U.S. at 376, 13 S.Ct. at 138.

Admittedly before the anteroom proceeding the defendants had some opportunity "to measure the demeanor of prospective jurors" and to hear responses "to questions about personal background, as well as general trial-related matters," Majority Opinion at pages 143–145, and I recognize that the *voir dire* in the anteroom was only twenty percent of the overall *voir dire*. Brief for Appellee at 32. But defendants are entitled to 100 per cent of their rights–an 80 per cent grant is not enough. Important issues of individual knowledge, preference and prejudice were explored in the anteroom. Not only did the judge question each juror about whether he or she had seen media reports of the crime, but he also asked each juror if there were any reasons why he or she would be prejudiced against the defendant or whether there were any other rea-

sons why he or she could not serve on the jury. The answers to these questions were undoubtedly significant in the decision about the peremptories. Can the majority say a juror's response to any of these inquiries would not have given defendants what the Supreme Court, Justice Storey and Blackstone said, that "everyone must be sensible to ... sudden impressions and unaccountable prejudices" because of the manner of the response? Can the majority say that any lawyer would be able to adequately articulate to the defendants what should be the defendants impression of "the bare looks and gesture of another."? *Lewis v. United States, supra.* I submit that looks, gestures and appearances which may be suspect to a defendant may seem innocuous to his lawyer. The defendants may have wished to hear what was said, to decide for themselves whether what a juror said "sounded" like the juror truly believed the answer given. The defendants may have wished to observe facial expressions, or other revealing physical reactions. These are the kinds of reactions which frequently form the basis of peremptory challenges. If we find today that non-verbal or intangible reactions to inquiries about prejudice and views are unimportant beyond a reasonable doubt, I query whether we would ever find intangibles significant.

Further, the majority ignores the question of burden of proof on this issue. Implicitly it has placed the burden on the defendants. That decision conflicts with the traditional rule that the burden rests on the government to prove that a procedure error of this sort is harmless beyond a reasonable doubt. *See generally Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

### III.

As I noted above, the defendants objected strenuously to their exclusion. The importance of the waiver in cases such as this is demonstrated by the fact that neither my review of the cases nor the majority's uncovered any instance where a defendant made a timely objection to his exclusion from his *voir dire* and it was not found to be reversible error. *See, e. g., United States v. Crutcher,* 405 F.2d 239, 242–43 (2d Cir. 1968). In every case cited by the majority in which the court held the exclusion was a harmless error, the defendant waived his right below. The majority's heavy reliance on *U. S. v. Alper, Appeal of Stanley M. Greenberg,* 449 F.2d 1223 (3d Cir. 1971), *cert. denied,* 405 U.S. 988, 92 S.Ct. 1248, 31 L.Ed.2d 453 (1972), *reh. denied,* 406 U.S. 911, 92 S.Ct. 1605, 31 L.Ed.2d 822 (1972), reveals that they fail to appreciate the significant and critical differences between cases where the litigants purposefully waived their right and those where, as here, the litigants protested *from the beginning* the court's preclusion of the defendants from a crucial portion of the trial process. In *Alper* this Court stated explicitly that "there is no indication whatever that [the defendants] were excluded from the discussions in chambers by any action of the court." 449 F.2d at 1231. In contrast here the defendants were precluded by the "action of the court." If the defendants' pointed objection was not enough to satisfy the majority, then there is nothing that a defendant could do to receive the right to be present "... at every stage of the trial including the impaneling of the jury" which the rules and the Constitution grant to a defendant.

In other cases cited by the majority the defendant's waiver followed an offer by the trial court to repeat the portion of the *voir dire* that the defendant had missed. *See, e. g., Phillips v. United States,* 533 F.2d 369, 372 (8th Cir.) *cert. denied,* 429 U.S. 924, 97 S.Ct. 324, 50 L.Ed.2d 292 (1976) ("Appellant ... was informed on the record that if he wished, he could have an entirely new trial."); *United States v. Dioguardi,* 428 F.2d at 1039 and n.4, *cert. denied,* 400 U.S. 825, 91 S.Ct. 50, 27 L.Ed.2d 54 (1970) (["T]heir experienced counsel, who had been earlier advised of the proposed procedure, did not ask that [the defendants] be allowed to come nearer the judge ... when the point was first raised ... the judge stated he would have granted such a request."); and *Henderson v. United States,* 419 F.2d 1277, 1278 (5th Cir. 1970) ("[T]he Court asked [defendant's] counsel whether there was

'any need ... to go back through the preliminaries with respect to the exercise of challenges for cause.' To this his counsel answered with a categorical 'No.' ").

The presence of the defendants' attorneys at the *voir dire* in the anteroom is not a waiver and does not alleviate the infirmity in this case. Candidly I am at a loss in understanding why the majority's opinion notes that the defendants were only 25 feet away from the anteroom where this separate hearing was being conducted. Defendants have neither bionic eyes nor bionic ears—for them the impressions which these witnesses made while being questioned in this adjacent room were as undiscernable as if that separate proceeding occurred a mile away.

As I noted above, the right to be present at trial implicates the right to one's own defense. The defendant, if he chooses, has the right to make his own judgments on the basis of a juror's "nationality, his business, religion, politics, social standing, family ties, friends, habits of life and thought; the books and newspapers he likes and reads ... [even to his] method of speech, the kind of clothes he wears, the style of haircut...." Darrow, Attorney for the Defense, *Esquire Magazine*, May 1936, *quoted in, United States v. Barnes*, 604 F.2d 121, 134 (2d Cir. 1979), *cert. denied*, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980), and to eliminate jurors "whether they be Negroes, Catholics, accountants or those with blue eyes." *Swain v. Alabama*, 380 U.S. at 212, 85 S.Ct. at 831. Here, defendants did not delegate the selection to their attorneys and they need not have done so.

### IV.

Having been a trial judge for more than thirteen years, I am sympathetic to the lower court's difficulties in the management of a complex and difficult case, and I applaud his concern for eliminating the impact of pretrial publicity. I am also aware

---

**3.** Because I believe the exclusion in this case was not harmless error, I do not reach the issue of whether a per se rule is desirable. Nor do I express any opinion on the consequences of removing an obstreperous defendant whose behavior is disruptive to the *voir dire* proceeding.

of the public's general hostility to any decision which requires a retrial on what some would consider a mere "technicality." I firmly believe, however, that the selection of a jury to sit in judgment and to decide the defendants' freedom is more than a technicality. As Mr. Justice Frankfurter observed more than three decades ago:

> In law, as in life, lines have to be drawn. But the fact that a line has to be drawn somewhere does not justify its being drawn anywhere.

*Pearce v. Commissioner of Internal Revenue*, 315 U.S. 543, 558, 62 S.Ct. 754, 761, 86 L.Ed. 1016 (1942) (Frankfurter, J., dissenting). I draw the line where as here the defendants have been intentionally excluded, over their objections and without good cause, from a significant portion of their *voir dire* proceeding.[3] As Judge Harold R. Medina once said, "The more odious and despicable the crime, the more important it is that justice be done."[4] In this case an injustice has been done, and fundamental procedural rights have been breached.

---

*See, Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970).

**4.** XII, Lloyd Paul Stryker, *The Art of Advocacy* (1954).